SALEM *v.* UNITED STATES LINES CO.

No. 283.   Argued March 19, 1962.—Decided May 28, 1962.

*Robert Klonsky* argued the cause for petitioner.   With him on the briefs was *Philip F. Di Costanzo.*

*Walter X. Connor* argued the cause and filed briefs for respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The first question to be decided in this seaman's personal injury suit for damages on the grounds of unseaworthiness and negligence under the Jones Act [1] is whether the jury should have been allowed to determine, in the absence of supporting testimony by an expert in naval architecture, a claim that the shipowner failed to equip his ship with necessary and feasible safety devices to prevent the mishap which befell the seaman.

The trial judge submitted for the jury's determination various bases of respondent's alleged liability, including

---

[1] 41 Stat. 1007, 46 U. S. C. § 688.

the claim resting on the failure to provide certain safety devices. Because the jury returned a general verdict for the seaman, it cannot be said what basis of liability the jury found to exist. The Court of Appeals for the Second Circuit, Judge Smith dissenting, reversed and remanded for a new trial, holding that in the absence of expert evidence, it was error to have allowed the jury to consider the failure to provide safety devices. 293 F. 2d 121, 123–124. Since the question whether supporting expert testimony is needed is important in litigation of this type, we granted certiorari. 368 U. S. 811. We hold that the Court of Appeals erred.

Petitioner was a lookout on the S. S. *United States.* He was injured as he moved from a ladder to a platform leading to his post in the crow's-nest. The crow's-nest was housed in a "bubble" half way up a hollow aluminum radar tower which rose 65 feet from the bridge deck. The ladder extended the full height of the tower along the inside of its after side. At various levels inside the tower were horizontal platforms, at the after ends of which were access openings slightly larger than manholes, through which the ladder passed straight up. The tower was more than six feet from fore to aft at the crow's-nest level, and tapered from four to three feet in width. There was only a narrow ledge around three-quarters of the opening in the platform at that level; the platform proper was toward the bow, and led to the door in the crow's-nest. As a seaman climbed the ladder to the crow's-nest, he faced astern until his feet were approximately level with the platform. To get from the ladder to the platform proper, he had to pivot, putting one foot on the starboard or port ledge, follow it with the other foot, complete his pivot and step forward along the ledge to the platform proper. Although the respondent describes the crow's-nest and its approach as "purposely constructed

so as to provide maximum protection and safety for members of the crew having to use it," there were no devices intended to facilitate safe maneuvering from ladder to platform; for support during this maneuver, the seaman could grasp one of the thin vertical beams located at intervals along the port and starboard sides, or a vertical, bulky rectangular pipe enclosing a radar cable and near the starboard side, or a horizontal stiffener or ledging that ran at shoulder-height around the tower. Respondent argues that the seaman also could simply spread his arms to brace himself against the sides of the tower.

On the night of February 15–16, 1958, as the *United States* went at high speed and rolled in rough seas, the tower was plunged into darkness, just as the petitioner was executing the movement to the crow's-nest platform from the ladder. Illumination within the tower was provided by five electric lights at various levels, but these burned out frequently. Two had been out for a long period and two others had gone out a few hours before the accident, leaving as the only light that which was at the crow's-nest platform. At some point after petitioner had begun the maneuver from ladder to platform, but before he reached a place on the platform proper and away from the access opening, that last light went out. An instant later petitioner fell backwards across the opening and struck his head against the ladder and his lower back against the fore edge of the opening, leaving his body suspended in the opening. He grasped the ladder rungs and called for help from the lookout on duty in the crow's-nest. With the lookout's aid he was able to seat himself on the starboard ledge with his legs hanging down through the opening and his right arm around the cable pipe. The lookout returned to the crow's-nest to phone the bridge for help. In his absence the petitioner became dizzy and fell through the opening to a place eight feet below the platform.

34

The only issue before us on this phase of the case is whether the trial judge erred in instructing the jury that they might find the respondent liable for unseaworthiness or negligence for having failed to provide "railings or other safety devices" at the crow's-nest platform. The Court of Appeals held that it was error to submit that question to the jury because "There was no expert testimony that proper marine architecture required the additional provision of railings or other safety devices on such a ladder or platform enclosed within a tower leading to a crow's nest. Should the jury, under these conditions, have been permitted to decide whether proper marine architecture required railings or other safety devices? In two recent cases, this court has held that a jury should not be permitted to speculate on such matters in the absence of expert evidence." [2] 293 F. 2d, at 123. There was evidence, in the form of testimony and photographs, from which the jury might clearly see the construction at the

---

[2] The majority quoted from *Martin* v. *United Fruit Co.*, 272 F. 2d 347, as follows: " 'Finally, we reject the plaintiff's contention that the trial court committed error in not permitting the jury to determine whether the placement of the hinge at the bottom of the deadlight was an improper method of ship construction so as to make the vessel unseaworthy. Surely this is a technical matter in which an expert knowledge of nautical architecture is required in order to form an intelligent judgment. Since no expert testimony was introduced, it was correct to exclude this matter from the jury's consideration.' " 293 F. 2d, at 123. The majority also quoted from *Fatovic* v. *Nederlandsch-Ameridaansche Stoomvaart, Maatschappij*, 275 F. 2d 188, in which the question was whether a stopping arrangement could feasibly be made part of a ton-and-a-half boom to keep it from swinging freely: " 'In any event, the question was one of nautical architecture about which jurors lack the knowledge to form an intelligent judgment in the absence of expert testimony. Martin . . . . Since there was no expert testimony on the matter, it should not have been submitted to the jury.' " 293 F. 2d, at 123–124. Whatever may have required that the jury have the aid of expert testimony in those cases, no showing is made of the necessity here.

crow's-nest level which we have described. If the holding of the Court of Appeals is only that in this case there are peculiar fact circumstances which made it impossible for a jury to decide intelligently, we are not told what those circumstances are, and our examination of the record discloses none.[3] If the holding is that claims which might be said to touch upon naval architecture can never succeed without expert evidence, neither the Court of Appeals nor the respondent refers us to authority or reason for any such broad proposition.

This is not one of the rare causes of action in which the law predicates recovery upon expert testimony. See Wigmore, Evidence (3d ed. 1940), §§ 2090, 2090a. Rather, the general rule is as stated by Mr. Justice Van Devanter, when circuit judge, that expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation . . . ." *United States Smelting Co.* v. *Parry,* 166 F. 407, 411, 415. Furthermore, the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous. *Spring Co.* v. *Edgar,* 99 U. S. 645, 658.

This Court has held, in a factual context similar to this, that there was no error, let alone manifest error, in having a jury decide without the aid of experts. *Spokane & Inland Empire R. Co.* v. *United States,* 241 U. S. 344,

---

[3] Compare *Texas & Pacific R. Co.* v. *Watson,* 190 U. S. 287, 290, in which there may have been peculiar difficulties impeding installation of any truly effective safety device.

was an action by the United States to recover penalties for violation of the Safety Appliance Act provision requiring handholds or grab-irons to be placed on the ends of railroad cars used in interstate commerce.[4]   The defendant railroad offered expert testimony to establish that the substitutes provided on its cars would accomplish the statute's purposes.   The jury had inspected the cars, and the expert evidence was excluded when the United States objected that this "was a matter of common knowledge." We held that "the court was clearly right in holding that the question was not one for experts and that the jury after hearing the testimony and inspecting the [cars] were competent to determine the issue . . . ."   241 U. S., at 351.[5]

In sum, we agree with Judge Smith in dissent below:

"There was before the jury sufficient evidence, both from oral testimony and from photographs, for it to visualize the platform on and from which plaintiff fell and to determine whether some railing or hand hold in addition to the structures present was reasonably necessary for the protection of a seaman passing from the ladder to the platform in the swaying mast.

". . . [There is no] blanket proposition that any and all theories of negligence and/or unseaworthiness which might touch on the broad field of 'naval architecture' may be properly submitted to a jury only if supported by expert testimony.   Here the potential danger was fairly obvious and a jury should be perfectly competent to decide whether the handholds furnished were sufficient to discharge the owner's

---

[4] 27 Stat. 531, 45 U. S. C. § 4.

[5] Although it was later held that the Safety Appliance Act has no room for the doctrine of equivalent, substitute devices, *St. Joseph & Grand Island R. Co.* v. *Moore,* 243 U. S. 311, the authority of *Spokane* on jury competence is unimpaired.

duty to provide his seamen with a safe place to work. Such a determination hardly requires expert knowledge of naval architecture . . . ." 293 F. 2d, at 126.

Indeed, "if there was a reason hidden from the ordinary mind why this condition of things must have existed, those facts called upon the defendant to make that reason known." *Missouri, K. & T. R. Co.* v. *Williams,* 103 Tex. 228, 231, 125 S. W. 881, 882; and see *Poignant* v. *United States,* 225 F. 2d 595, 602 (concurring opinion).[6]

There is another question to be decided. The petitioner also sought maintenance and cure. The trial judge awarded past maintenance, which the respondent has not disputed, and also future maintenance for three years. The Court of Appeals set aside the award of future maintenance, saying: "There does not appear to be any sufficient basis, by opinion evidence or otherwise, for the finding that three years is the period reasonably to be

---

[6] The value of an expert's testimony to explain what the best safety device might be is clear, but the question here is simply whether some such device should have been provided. *Zinnel* v. *United States Shipping Board Emergency Fleet Corp.,* 10 F. 2d 47, 48. Nor would expert testimony about customary equippage be essential, *Pure Oil Co.* v. *Snipes,* 293 F. 2d 60, 71; nor, even if offered, would it have concluded the questions of unseaworthiness or negligence. *Wabash R. Co.* v. *McDaniels,* 107 U. S. 454, 460–461; *Grand Trunk R. Co.* v. *Richardson,* 91 U. S. 454, 469–470; *The T. J. Hooper,* 60 F. 2d 737; *Kennair* v. *Mississippi Shipping Co.,* 197 F. 2d 605; *June T., Inc.,* v. *King,* 290 F. 2d 404.

Although the law favors the aid of experts if the problem is not one "upon which the lay or uneducated mind is capable of forming a judgment," *Milwaukee & St. P. R. Co.* v. *Kellogg,* 94 U. S. 469, 472, if the matter is only arguably beyond common experience, expert testimony will be admitted with care. The rule reflects the consideration of avoidance of unnecessarily prolonged trials and attendant expense and confusion. *Winans* v. *New York & Erie R. Co.,* 21 How. 88, 100–101; and see *Thorn* v. *Worthing Skating Rink Co.* (1876), reported in *Plimpton* v. *Spiller,* 6 Ch. D. 412, footnote at 415–418 (1877).

expected for Salem to reach maximum improvement." 293 F. 2d, at 125. The trial judge made no findings. We have therefore examined the evidence on the question in the light of what was said in *Calmar S. S. Corp. v. Taylor*, 303 U. S. 525, 531–532: ". . . [A]mounts [for future maintenance should be such] as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained." We agree that the evidence provides no support under that test for the award of three years' future maintenance.

We affirm as respects maintenance but otherwise reverse the judgment of the Court of Appeals. Since other grounds of reversal urged by the respondent were not reached by that court, the case is remanded to it for further proceedings in conformity with this opinion.

*It is so ordered.*

Mr. Justice Frankfurter took no part in the decision of this case.

Mr. Justice White took no part in the consideration or decision of this case.

Mr. Justice Harlan, dissenting in part and concurring in part.

I do not read the Court of Appeals' opinion either as holding that, because of "peculiar fact circumstances" petitioner's claims respecting the alleged faulty construction of the radar tower required *"supporting* expert testimony" (*ante,* pp. 35, 32) (emphasis added), or as establishing a general proposition that such testimony is needed in every instance where a seaman claims to have been injured because of his employer's failure to equip a ship with safety devices.

Taking its opinion in light of the record, I think it apparent that the Court of Appeals held no more than that reversal was required because "there was no evidence of *any kind* in the record to support the view that railings or other safety devices could feasibly be constructed, or that failure to provide them constituted negligence or made the ship unseaworthy." 293 F. 2d, at 123. (Emphasis added.) To me it seems clear that the court referred to expert testimony simply as an example of the kind of evidence that the petitioner might have offered on this score. Consequently, the District Court's charge that the jury could find the respondent negligent "in failing to provide railings or other safety devices" had injected into the case a theory of liability which had not been presented to the jury by the evidence introduced at the trial. This has uniformly been held to constitute reversible error. *E. g., Mandel* v. *Pennsylvania R. Co.,* 291 F. 2d 433; *Smith* v. *Ellerman Lines, Ltd.,* 247 F. 2d 761, 766; see *Wilmington Star Mining Co.* v. *Fulton,* 205 U. S. 60, 78–79.

The trial transcript, insofar as it has been reproduced in the record before this Court, bears out the conclusion of the Court of Appeals that evidence with respect to the alleged failure to maintain appropriate safety devices was entirely lacking. Petitioner's evidence, apart from medical testimony concerning the extent of his injuries, related almost entirely to the alleged slippery condition of the platform leading to the crow's-nest, the inadequate and defective lighting, and the negligence of the lookout. Petitioner himself did testify that there was no "grip" or "handrails" at the crow's-nest level, and photographs that were introduced into evidence confirmed this undisputed assertion.

With nothing more before the jury than this, the trial court's instruction certainly left the jury entirely at large

to reach an uninformed conclusion as to what would have constituted reasonable conduct on the part of the respondent with respect to the equipping of this part of the ship. No evidence of any kind was introduced to show whether radar towers on vessels of this sort ordinarily were equipped with safety devices or whether seamen assigned thereto had need of such equipment in the ordinary course of their activities. Expert testimony would have served this purpose, as would any other evidence bearing probatively on the reasonableness of respondent's conduct in failing to equip its vessel with these devices. In the absence of any such evidence the Court of Appeals was entirely justified in holding that the District Court's instruction amounted to reversible error.

I agree with this Court's holding as to future maintenance. I would affirm.