Stephen J. **SCHLADER** and Carol J. Schlader, Appellants,

v.

**INTERSTATE POWER COMPANY,** Appellee.

No. 96–1818.

Supreme Court of Iowa.

March 24, 1999.

Rehearing Denied April 16, 1999.

Jeff Carter of Tom Whitney Law Offices, Des Moines, for appellants.

David L. Hammer and Angela C. Simon of Hammer, Simon & Jensen, Dubuque, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

HARRIS, Justice.

Summary judgment was entered against the plaintiffs, dairy farmers, in this "stray voltage" suit. Plaintiffs appeal, especially challenging a trial court ruling rejecting proffered testimony of their expert witness. We affirm in part, reverse in part, and remand.

Interstate Power Company [hereinafter IPC] provides electricity to the dairy farm of Stephen Schlader and Carol Schlader [hereinafter Schladers]. The Schladers bought their farm in August 1985. For the next four years, the Schladers claim their dairy cow herd suffered decreased milk production and health problems. The Schladers' milking equipment supplier is said to have discovered stray voltage measuring well over a full watt stemming from IPC's power lines. IPC sent two employees to install an "isolator" or "block." It is claimed that the positive effects on the Schladers' herd were immediate and significant.

The Schladers thereafter filed this petition against IPC seeking money damages for claimed past and continuing problems with stray voltage. The suit included counts in negligence, strict liability, breach of implied warranties, and breach of contract, as well as a claim for gross negligence. The district court entered summary judgment against the Schladers, based on contentions we describe in the divisions that follow. The matter is before us on the Schladers' appeal.

■ I. We generally view evidentiary rulings for abuse of discretion. *Williams v. Hedican*, 561 N.W.2d 817, 822 (Iowa 1997). A trial court may commit an abuse of discretion if it unreasonably refuses to allow an expert qualified by experience. *Hutchison v. American Family Mut. Ins. Co.*, 514 N.W.2d 882, 886 (Iowa 1994).

■ Summary judgment is proper when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. *Knapp v. Simmons*, 345 N.W.2d 118, 121 (Iowa 1984). Every legitimate inference that reasonably can be deduced from the evidence should be afforded the nonmoving party. *Id.* Summary judgment may be appropriate in an instance in

which expert testimony is required to establish negligence or foundational facts, and expert testimony is unavailable, therefore no genuine issue of fact can be proved. *Welte v. Bello*, 482 N.W.2d 437, 440 (Iowa 1992).

Stray voltage has been addressed by many courts including our own; the concept is not new. *See Hegg v. Hawkeye Tri–County REC*, 512 N.W.2d 558 (Iowa 1994) (customers alleging damage to their dairy herd by stray voltage were alleging continuing wrong and could recover for damages occurring within five-year statute of limitation); *Fox v. Interstate Power Co.*, 521 N.W.2d 762 (Iowa App. 1994) (dairy farmer argued against apportionment of fault in stray-voltage case); *see also Federated Rural Elec. Ins. Co. v. Nationwide Mut. Ins. Co.*, 874 F.Supp. 1204 (D.Kan.1995) (case arose from insured's alleged failure to prevent or causing of stray-voltage problems); *Haile v. Arkansas Power and Light Co.*, 322 Ark. 29, 907 S.W.2d 122 (1995) (action brought against electric utility for damages suffered to cattle allegedly caused by stray voltage); *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426 (Mo.1985) (purchaser of automatic milking system sued distributor and seller alleging negligent installation for failure to test for stray voltage); *Larson v. Williams Elec. Coop., Inc.*, 534 N.W.2d 1 (N.D.1995) (farmer brought action against electric cooperative seeking recovery of damages to dairy farm allegedly caused by stray voltage); *Kuper v. Lincoln–Union Elec. Co.*, 557 N.W.2d 748 (S.D.1996) (dairy farmers brought action against nonprofit rural electric cooperative for damages allegedly caused by stray voltage); *ZumBerge v. Northern States Power Co.*, 481 N.W.2d 103 (Minn.Ct.App.1992) (consumers brought suit against electric utility for damages resulting from stray voltage which injured their dairy herd); *Johnson v. Steele–Waseca Coop. Elec.*, 469 N.W.2d 517 (Minn.Ct.App.1991) (farmer sued electric utility alleging damages to his cattle herd from stray voltage).

Those urging a stray-voltage recovery would describe the concept this way:

> In order to understand stray voltage or neutral-to-earth voltage, one must first understand the neutral-grounded network. All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.
>
> Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waters. The current simply uses the cow as a pathway in its eventual return to the substation. Apparently very slight voltages can affect cattle. Evidence [has] suggested anything greater than one volt can be catastrophic to a dairy farm.

*Larson*, 534 N.W.2d at 1–2 n. 1.

■ II. The Schladers urge us to adopt a rule of strict liability against power companies regarding stray voltage. Strict liability does not arise merely because a public utility is involved. *Northwestern Nat'l Ins. Co. v. Raid Quarries Corp.*, 249 N.W.2d 640, 645 (Iowa 1977) (gas company not an insurer for injuries resulting from escape of gas). It seems apparent that we would astonish the legislature if we were to adopt strict liability regarding stray voltage. An

Iowa statute, Iowa Code section 489.16 (1966), formerly provided:

> Injury to Person or Property. In case of injury to any person or property by any such transmission line, negligence will be presumed on the part of the person or corporation operating said line in causing said injury, but this presumption may be rebutted by proof.

This statute was repealed. 1986 Iowa Acts ch. 1198, § 1. Repeal of the statute weighs strongly against strict liability. We refuse to impose it.

■ III. The Schladers vigorously challenge a trial court finding that their expert was not qualified to testify, asserting the witness could not assist a jury in understanding the subject matter of their claims. *See* Iowa R. Evid. 702 (expert's testimony admissible if it "will assist the trier of fact to understand the evidence or determine a fact at issue"). Under the standard we explained in *Leaf v. Goodyear Tire & Rubber Co.,* 590 N.W.2d 525, 531 (Iowa 1999), we reject the challenge.

It is true that the plaintiffs' designated expert, Duane A. Dahlberg, listed an impressive academic background:

> Utah State University: Meteorology, Solar Radiation; 1976–77
>
> Montana State University: Physics, Ph.D. degree; 1964–67
>
> Texas A & M University: Physics; 1963
>
> Luther Theological Seminary: Theology; B.D. degree; 1957–60
>
> Michigan Technological University: Physics, Mathematics, Chemistry; B.S. and M.S. degrees; 1949–54

Academic background does not however alone qualify an expert witness.

There is much to support the trial court's conclusion here that Dahlberg's testimony would be more misleading than helpful. Dahlberg was to testify concerning his theory that electric currents emanate from the earth, causing serious health and production problems for dairy herds. He refers to these currents as "stray voltage," a label that IPC's experts consider a confusing misnomer because they insist "stray voltage" is a term not properly ascribed to theoretical currents, but rather to an unrelated condition well understood by those knowledgeable in the field. By his own admission, Dahlberg had no scientific "model" beyond the formative stage, and any proof regarding his "cause and effect" theories lies a long time in the future. Although others need sophisticated instrumentation to detect stray voltage, Dahlberg believes he needs no instruments other than his "witch stick" or "magic wand" to detect electricity. This is because Dahlberg claims the ability to "sense" the presence of stray voltage. He espouses unsupported theory that electrical currents exist even in communities where there is no use of electrical power. Equally unsupported, and contrary to all known scientific principles, is his theory that there can be electric current with no measurable voltage.

The definitive work in the field of stray voltage, by Dahlberg's own admission, is a publication of the United States department of agriculture entitled Effects of Electrical Voltage/Current on Farm Animals, How to Detect and Remedy Problems. This publication represents a compilation of the work of experts in the field of stray voltage, and outlines scientifically accepted theories and techniques. Dahlberg's beliefs are wholly out of plumb with this publication. They must be described as bizarre. He reports a case in which a dairy farmer, his wife and their daughter, got swollen "bellies" when they went into their barn. He reports another case in which a farmer had a "magnetic bubble" over his farm. He reports cases in his knowledge where persons have lost their short-term memory because they live near a power facility and where a person's multiple sclerosis was in some way correlated to an electromagnetic field. Dahlberg even reports he was involved with a dairy farmer who was unable to stand still in his barn and would jitter and jump, and his wife would cry uncontrollably every time she came near the cows and the barn.

■ We cannot say, under the scope of review explained in *Leaf,* this is a case where we should interfere with a trial court's rejection of a witness' testimony. Appellate

courts accord much deference to a trial court's exercise of discretion in the matter. *Mensink v. American Grain & Related Indus.,* 564 N.W.2d 376, 380 (Iowa 1997). The assignment is rejected.

▮▮▮ IV. Although we have rejected the Schladers' foregoing assignments, we cannot conclude the case should be dismissed. For one thing we also reject IPC's contention that an expert should be required in order to prevail in a stray-voltage claim. IPC contends:

> [I]t is incumbent upon plaintiffs, in order to generate a jury question, to show by expert testimony what the pertinent standards of care are, that defendant failed to comply with those standards, and that Interstate's failure to do so was a proximate cause of plaintiffs' damages.

We think, although expert testimony would clearly be helpful to fact finders in such a claim, it is not a condition precedent. Expert testimony is required in actions based upon the negligence of a professional. *See Wilson v. Darr,* 553 N.W.2d 579 (Iowa 1996) (expert testimony required in professional negligence suit against licensed counselor); *Kennis v. Mercy Hosp. Med. Ctr.,* 491 N.W.2d 161 (Iowa 1992) (expert testimony required in medical malpractice case); *Eventide Lutheran Home v. Smithson Elec. & Gen. Constr., Inc.,* 445 N.W.2d 789 (Iowa 1989) (expert testimony required in action against engineering firm to prove specific negligence).

▮▮▮ It is the complexity of professional negligence cases that requires expert testimony. IPC argues that stray-voltage cases are technical in nature and thus require such testimony. Although testimony of witnesses having specialized education and training, or special experience and knowledge, is often admitted into evidence on the ground of necessity, it is not necessarily required merely because a case involves matters of science, special skill, special learning, knowledge, or experience which may be difficult for jurors to comprehend. 31A Am.Jur.2d § 40, at 49.

Causes of action which predicate recovery upon expert testimony are rare. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313, 317 (1962)

(in suit by seaman expert testimony regarding naval architecture and safety devices not necessary). *Salem* stands for the rule that expert testimony is generally unnecessary and may be properly excluded:

> if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

*Id.*

The subject of stray voltage is certainly technical. But the nature of electricity and the results of contact with it by humans and animals is not beyond a common person's understanding. We reject IPC's contention that expert testimony is required in a stray-voltage case.

▮▮▮ V. Because expert testimony is not required, the case should not have been dismissed. Every legitimate inference that can be reasonably deduced from the evidence should be afforded the nonmoving party. *Knapp v. Simmons,* 345 N.W.2d 118, 121 (Iowa 1984). A fact question is generated if reasonable minds can differ on how the issue should be resolved. *Id.* The Schladers cited evidence by the milking equipment supplier that he discerned the voltage problems on their farm. There were also depositions of analysts reciting that the isolator or block installed by IPC did decrease the voltage in the Schladers' milking parlor. There was also testimony from a veterinarian that related the health problems experienced by the Schladers' dairy herd. He also noted the improvement in the milking herd after the block or insulator was installed. According the Schladers' "every legitimate inference" from their evidence, it cannot be said they have failed to show injuries to the dairy herd resulting from electric voltage in the milking parlor.

The case must be remanded for further proceedings in conformity with this opinion.

Tax costs fifty percent to the Schladers; fifty percent to Interstate.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**