Fred O. THOMPSON, Appellant,

v.

EMBASSY REHABILITATION AND CARE CENTER and Lantis Enterprises, Inc., Appellees.

No. 98–965.

Supreme Court of Iowa.

Jan. 20, 2000.

Rehearing Denied March 13, 2000.[†]

Daniel C. Galvin of O'Brien, Galvin & Moeller, Sioux City, for appellant.

Michael W. Ellwanger of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, L.L.P., Sioux City, for appellees.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, CADY, and HARRIS,* JJ.

† LARSON, J., taking no part.

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

CARTER, Justice.

Plaintiff, Fred O. Thompson, appeals from an adverse summary judgment in an action seeking to recover for alleged improper care at a skilled nursing facility operated by defendants, Embassy Rehabilitation and Care Center and Lantis Enterprises, Inc. He contends that defendants were negligent in the management of a bedsore that developed into a severe coccyx ulcer. Specifically, Thompson alleges that the defendants failed to position him in a way that would lessen the pressure on the affected area. He also urges that defendants failed to seek inpatient hospital care and necessary surgery for his condition when the need therefor arose. Thompson failed to designate an expert witness to testify concerning the standard of care under the circumstances. Based on this omission, the district court granted the defendants' motion for summary judgment, concluding that the standard of care under the circumstances was not obvious or within the common knowledge of a lay jury. After reviewing the record and considering the issues presented, we affirm the judgment of the district court.

In 1985 and 1987, Thompson suffered strokes that left him a quadriplegic and unable to speak. In 1988, he became a resident of a skilled nursing facility operated by defendants. A skilled nursing facility is one that takes care of patients who are referred to as heavy-need patients. Thompson was age forty-four when he entered defendant's care facility. He had minimal head movement and minimal ability to lift his upper extremities. He communicated through the use of an alphabet board.

In September 1994, the staff at the care facility noted that Thompson, then age fifty, had a protrusion or a bump on his left leg above the knee. He was taken to a hospital where a fracture was diagnosed. He was also diagnosed as having osteoporosis. His bones had become extremely brittle so that a fracture could result from lifting him from one position to another.

After returning to defendants' care facility following the treatment of his fracture, ulcerated bedsores were noticed on Thompson's lower left buttock. His personal physician, Dr. Kathryn Opheim, was notified, and she authorized the use of a particular type of ointment that requires physician approval. On September 26, 1994, the staff at defendants' care facility contacted Dr. Opheim and requested the services of an enterostomal therapy nurse for treatment of Thompson's sores. They also requested an order for a special air flotation cushion. These requests were granted.

Karen Larsen, an enterostomal therapy nurse employed by a local hospital, was contacted, and she visited Thompson on September 27. Over the next several months, continuing until January 16, 1995, nurse Larsen examined Thompson on sixteen separate occasions in order to evaluate his condition, provide care, and make recommendations to the care facility staff. During this time, medications and "enzymatic debridement" were used to treat the sores, one of which had been diagnosed as a coccyx ulcer. According to affidavits filed in support of the summary judgment motion, which included the medical notes of Dr. Opheim and the nursing notes of Karen Larsen, Thompson resisted repositioning methods used to reduce the pressure on the ulcers.

In Dr. Opheim's September 27 medical report on Thompson, she commented on these ulcers.

> The biggest problem with Fred is that he refuses to change position every two hours. He has a position that he will allow himself to be placed in and refuses anything different. While I was visiting with him today, he wanted to have his feet quite elevated, his head up which essentially put him in a V-position, the base of the V being his ulcer. It's our recommendation that we use a wedge cushion in his bed and roho cushion for his chair to allow a better distribution of

pressure but unfortunately he doesn't allow us to do everything that we want. Nurse Larsen likewise noted Thompson's resistance to repositioning in her notes of October 11:

It is also important to note that although we have implemented several pressure reduction measures for this patient, he has been noncompliant as he is insistent on remaining flat on his back with the head of the bed up slightly. He is also up in his chair with pressure reduction cushions for at least one hour b.i.d., at which time, he also refuses to lie on his side. Although we have encouraged and educated the patient on pressure reduction measures, he has been noncompliant. This delays the wound healing and makes it more difficult to get a good healing surface.

By early November, the coccyx ulcer had improved from stage 3 to stage 2. By mid-November, however, it had returned to stage 3. On November 15, nurse Larsen questioned Thompson and encouraged him to lay on his side, but he shook his head no. Nurse Larsen's November 22 medical notes on Thompson state as follows:

We will continue to work with the patient on stressing the importance of staying repositioned off of his coccyx in order to promote wound healing. The patient frequently blinks his eyes and responds to no and also shakes his head and becomes upset whenever we reposition him off his back. It is explained to the patient that if he did not stay off the back, that the ulcer would continue to deteriorate and we would end up with a large crater or hole in the bottom for him to deal with. The patient responded no by blinking no and shaking his head.

During the month of December, there were periodically indications of improvement. By January 3, 1995, however, the coccyx ulcer deteriorated to stage 4. Nurse Larsen suggested to Dr. Opheim the possibility of consulting a surgeon. On January 16 Thompson was taken to a local hospital.

He was evaluated by Dr. Opheim, nurse Larsen, and a surgeon. It was agreed that surgery would be the best approach.

Pressure sore in his coccygeal region has not healed for the past 10 weeks and has become quite deep. He apparently has been very noncompliant with positioning at the nursing home up until here recently when he has finally agreed to become compliant.

A surgical trimming and skin graft procedure was performed. After the surgery, Thompson made slow and steady progress, and the ulcer ultimately healed.

Nurse Larsen recounted most of the foregoing facts in an affidavit filed in support of the motion for summary judgment. She stated in that affidavit that Dr. Opheim and she had initiated the correct standard of care for treating Thompson's ulcer and, to the best of their ability, instructed the nursing staff at the care facility with respect to carrying out those procedures. She stated her belief that the staff had followed the prescribed procedure to the best of their ability in the face of Thompson's recalcitrance. Marlene Kroger, the supervising nurse at defendants' care facility, also filed an affidavit in support of the summary judgment motion in which she stated that it was the practice of the care facility's staff to reposition Thompson every two hours so as to avoid pressure on the area of the coccyx ulcer. She further stated that Thompson resisted such efforts by stiffening up, shaking, or writing "no" on his communication board.

■ There are two basic situations in which summary judgment may be granted: (1) when, as provided in Iowa Rule of Civil Procedure 237(c), the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, reveal the existence of undisputed facts that affirmatively establish the moving party's right to judgment, *Barrett v. Lode,* 603 N.W.2d 766, 767 (Iowa 1999); *Griglione v. Martin,* 525 N.W.2d 810, 813 (Iowa 1994); *Goodwin v. City of Bloomfield,* 203 N.W.2d 582, 588 (Iowa 1973); or

(2) when the party can demonstrate that the proof of the other party is deficient as to a material element of that party's case, *Griglione*, 525 N.W.2d at 813. With respect to the latter situation, which is the one with which we are presently confronted, we have stated that the mere filing of a summary judgment motion does not serve to limit the extent of the nonmoving party's potential proof at trial. Such limits must be established through procedural devices separate and apart from the summary judgment motion, such as answers to interrogatories or pretrial orders limiting proof. *Id.* at 814. In the present case, it has been established through interrogatories and a deposition that Thompson does not have an expert witness who will testify as to the standard of care to be employed by defendants' skilled nursing facility.

We must review the district court's summary judgment ruling as to both of the matters Thompson has placed in issue, *i.e.*, whether the decision to surgically treat his condition was unduly delayed and whether the care facility was negligent with respect to its efforts to reposition his body so as to relieve pressure from the affected area. As to the first of these matters, we are convinced that the time of the decision to perform surgery required a medical judgment. Assuming, without deciding, that the defendants could be held liable for an erroneous decision in that regard, such liability cannot attach in the absence of expert testimony establishing the proper standard of care under the circumstances. *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999); *Kennis v. Mercy Hosp. Med. Ctr.*, 491 N.W.2d 161, 165 (Iowa 1992).

A closer question is presented with respect to Thompson's claim that the care facility staff was negligent in not regularly repositioning him properly in response to the instructions of Dr. Opheim and nurse Larsen. Such acts on the surface appear to have been ministerial and thus subject to a standard of proof not requiring expert testimony. *See Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 102 (Iowa 1971) (expert testimony not required to establish the standard for ministerial or routine care); *Landes v. Women's Christian Ass'n*, 504 N.W.2d 139, 141 (Iowa App. 1993) (same). But the special circumstances of the present case are such that the issue had become one of forced repositioning of the care facility resident contrary to his own wishes. We believe that under these circumstances the proper course of action was not a matter that would be within the common understanding of the jury. We have stated the test as follows:

> [I]f all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation, [expert testimony is not required].

*Schlader*, 591 N.W.2d at 14. Application of this test to the special circumstances of this case support the district court's ruling to require expert testimony. We have considered all issues presented and conclude the judgment of the district court should be affirmed.

**AFFIRMED.**