IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 08-0231
════════════
 
 
Omaha Healthcare Center, LLC, 
Petitioner,
 
v.
 
Wilma Johnson, on Behalf of 
the Estate of
Classie Mae Reed, Deceased, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Sixth 
District of Texas
════════════════════════════════════════════════════
 
 
            
Justice Lehrmann, joined by 
Justice Medina, dissenting
 
            
Expert testimony is often critical to assist the trier of fact. See Salem v. U.S. Lines Co., 370 U.S. 
31, 32 (1962). Complex matters need to be explained to aid in assessing the 
nature of the claims and separating the meritorious from the frivolous. See 
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993). An expert witness may testify 
regarding “scientific, technical, or other specialized” matters if the expert is 
qualified and if the expert’s opinion is relevant and based on a reliable 
foundation. Tex. R. Evid. 702; Mack Trucks, Inc. v. Tamez, 
206 S.W.3d 572, 578 (Tex. 2006); E.I. du Pont de Nemours & Co. v. 
Robinson, 923 S.W.2d 549, 556–57 (Tex. 1995).
            
Our Legislature, in enacting the health care liability claim statute, 
recognized the importance of expert testimony in medical malpractice suits by 
requiring that plaintiffs serve, within 120 days, expert reports for each health 
care provider against whom a liability claim is brought. Tex. Civ. Prac. & Rem. 
Code § 74.351(a). 
The Legislature defined a health care liability claim as one “against a health 
care provider or physician for treatment, lack of treatment, or other claimed 
departure from accepted standards of medical care, or health care, or safety or 
professional or administrative services directly related to health care, which 
proximately results in injury to or death of a claimant.” Id. 
§ 74.001(a)(13). In holding that a spider bite 
in a nursing home is a health care liability claim for which an expert report is 
required, the Court reaches a result that is contrary to the Legislature’s 
intent, belies common sense, and contorts the role of experts in health care 
litigation.
 
            
The Court has not, at least so far, expressly held that all 
injuries in a health care setting, regardless of any relationship to medical 
care, must be filed as health care liability claims. But today’s opinion does as 
much implicitly. In doing so, the Court radically departs from our clear 
assurances that there can be “premises liability claims in a healthcare setting 
that may not be properly classified as health care liability claims,” Diversicare Gen. Partner, Inc. v. Rubio, 185 
S.W.3d 842, 854 (Tex. 2005), and the plurality’s recognition in Marks v. St. 
Luke’s Episcopal Hospital that safety-based health care liability claims 
necessarily implicate medical care standards. 319 S.W.3d 658, 
664 (Tex. 2010) (plurality opinion). In Marks, the plurality noted 
that the alleged negligence in health care safety claims must be “inseparabl[y] and integral[ly]” related to the rendition of medical services. 
Marks, 319 S.W.3d at 664; see Diversicare, 185 S.W.3d at 848–49. In applying that 
standard, we have heretofore considered a number of factors, among them whether 
a specialized standard in the health care community applies in the particular 
circumstances; whether the alleged negligence involves medical judgment related 
to patient care or treatment; and whether expert testimony from a medical 
professional is necessary to prove a cause of action. See Diversicare, 185 S.W.3d at 
847–52. But the Court considers none of these limiting factors in the 
present case, effectively holding that all premises claims by injured 
patients are health care liability claims.
            
In Diversicare, we emphasized that the 
acts or omissions at issue were inseparable from the provision of health care, 
carefully distinguishing them from garden-variety negligence claims like those 
stemming from “an unlocked window” or a “rickety staircase.” Id. at 854. Similarly, in Marks, the 
plurality’s holding that an injury caused by a defective footboard on a hospital 
bed was a health care liability claim turned on the fact that a hospital bed, 
unlike a typical one, was “[m]edical equipment 
specific to [the] particular patient’s care or treatment,” and thus an “integral 
and inseparable part of the health care services provided.” Marks, 319 S.W.3d at 664. The Marks plurality noted that the 
Legislature could not have intended that safety standards within the statute’s 
scope “encompass all negligent injuries to patients” in light 
of the statute’s “more specific standards of medical and health care.” 
Id. In my view, a spider, in any setting, is more akin to a rickety 
staircase than a condition resulting from medical negligence or defective 
medical equipment.
            
In holding that inadequate pest control is a health care safety 
violation, the Court essentially declares that all injuries in a health care 
setting are subject to Chapter 74, without explicitly saying so. As a result of 
the Court’s holding, any patient injured in a hospital will be required to file 
an expert report even though the injury is entirely unrelated to the delivery of 
health care services. If it had been the Legislature’s intent to subject all 
claims against health care providers to the statute, “it would have defined a 
‘health care liability claim’ to be any claim against a physician or health care 
provider in a medical or health care setting.” See Drewery v. Adventist Health System/Tex., Inc., 
No. 03–10–00334–CV, 2011 WL 1991763 at n. 4 (Tex. App.—Austin May 20, 2011, no 
pet. h.). Given the sweeping interpretation of “safety” implicit in the Court’s 
conclusion, I urge the Legislature to clarify whether a safety violation must be 
related to health care.
            
The present case is the Court’s second opinion in two months to hold that 
a health care provider’s departure from general safety standards gives rise to a 
health care liability claim. See Harris Methodist Fort Worth v. Ollie, 
___ S.W.3d ___ (Tex. 2011) (per curiam). In Harris 
Methodist, we held that a patient’s post-knee-replacement slip and fall on a 
slick bathroom floor was a health care liability claim. I agreed with the 
Court’s decision because the underlying nature of Ollie’s 
claim—the hospital’s failure to supervise her or warn her of the slick 
floor—bore on the staff’s medical judgment in assessing her post-surgery 
condition and her ability to safely bathe. See id. at ___. Applying Diversicare, it was logical to presume that health 
care providers generally adhere to specialized standards governing post-surgical 
patient care, including assessing the patient’s ability to safely bathe without 
assistance, necessitating expert testimony on that issue. Likewise, expert 
medical testimony may have been necessary to prove that lack of supervision or 
assistance specific to the patient’s condition resulted in the injuries. None of 
those factors are present in Omaha.
            
In Harris Methodist, we noted that the underlying nature of the 
patient’s claim determines “whether the claim is for a departure from accepted 
standards of safety” relating to an act that should have been performed on the 
patient’s behalf during the patient’s medical care, treatment, or confinement. 
Id. at ___. Because medical expert testimony 
would have been necessary on whether the hospital should have provided special 
equipment or staff supervision to allow the patient to safely bathe, the claim 
was the type the Legislature intended to be governed by the statute. The same 
cannot be said, though, of a nursing home’s extermination procedures. Wilma 
Johnson’s claim against the nursing home involves the home’s failure to keep the 
premises properly treated for pests, leading to her sister’s death as the result 
of a brown recluse spider bite. The nursing home’s alleged negligence did not 
involve defective medical equipment or a lapse in medical judgment, but instead 
a general, common-sense duty to keep the premises clean and bug-free. This is 
not a situation where the jury would be aided by expert medical opinion. No 
medical judgment or expertise is implicated in determining whether Omaha adopted 
proper extermination standards.
            
The Court’s holding that Omaha’s failure to prevent a spider infestation 
is a health care liability claim, of course, means that Johnson was required to 
serve an expert report in order to avoid dismissal. See Tex. Civ. Prac. & Rem. 
Code § 74.351(a). 
An expert qualified to file a report on the health care provider’s departure 
from accepted standards of care must “practic[e] 
health care in a field of practice that involves the same type of care or 
treatment,” “ha[ve] knowledge of accepted standards of 
care for . . . the diagnosis, care, or treatment of the illness, injury, or 
condition involved in the claim[, and be] qualified on the basis of training or 
experience to offer an expert opinion regarding” those standards. Id. 
§ 74.402(b); see also id. § 74.351(r)(5)(B). In assessing witness qualifications, the court 
should look at licenses, certifications, or substantial training or experience 
“in the area of health care relevant to the claim,” as well as active practice 
in the health care industry relevant to the claim. Id. 
§ 74.402(c). In making this determination, the court is permitted to 
depart from the above criteria only if it determines, and states so on the record, that there is good reason to admit the 
proffered testimony. See id. § 74.402(d).
            
Applying the Court’s holding, Johnson’s experts would need to testify on 
what the applicable standard of pest control would be in providing a safe 
nursing home environment, whether allowing a spider infestation departs from 
that standard, and whether that departure caused the patient’s injuries. See 
id. § 74.351(a), (r)(6). Presumably, the 
expert report would outline the standard of care in selecting pest control 
services for a prudent nursing home, as well as Omaha’s breach and causation. 
See id. 
§ 74.351(r)(6) (expert report must state “applicable standards of 
care, the manner in which the care . . . failed to meet the standards, and the 
causal relationship between that failure and the injury, harm, or damages 
claimed”).
            
Omaha argues that in addition to physician testimony on causation, 
Johnson had to produce testimony from an “expert qualified to address 
application of pesticide in the context of a nursing home” to establish the 
“correct dosage . . . to prevent a breach of the standard of care by allowing a 
brown recluse to harm a resident, without the pesticide harming the resident.” 
It is hard for me to imagine how this expert could be anyone other than a 
professional exterminator, not the health care practitioner that the statute 
contemplates. And even if the court were to use the “good cause” exception in 
section 74.402(d) to qualify an exterminator as an expert on measures necessary 
to prevent spider infestation, I cannot imagine how the exterminator could be 
qualified to testify that the nursing home’s practices breached a medical 
standard of care. See Marks, 319 S.W.3d at 664; see also 
Diversicare, 185 S.W.3d at 854 (suggesting that 
unsafe conditions unrelated to provision of health care might not be health care 
liability claims). The Court’s imposition of Chapter 74 requirements in a way 
the Legislature never intended is what leads to this jarring result.
            
The Court’s contorted reading of the statute will disserve both patients 
and health care providers. As the dissent in Marks warned, “[b]y sweeping 
even simple negligence claims under the umbrella of medical malpractice 
insurance policies, the Court risks broadening the class of claims that medical 
malpractice insurance companies must cover.” Marks, 319 
S.W.3d at 686 (Guzman, J., concurring and dissenting). Health care 
providers will incur higher medical malpractice insurance premiums as insurers 
adjust their rates to account for more claims attributed to medical malpractice. 
See Diversicare, 185 S.W.3d at 862 (O’Neill, 
J., dissenting) (noting that providers carry both general and malpractice 
liability policies, and health care liability claim litigation expenses fall 
under the malpractice policy). This defeats the very purpose of the statute as 
expressed by the Legislature, “which is to reduce the cost of medical 
malpractice insurance in Texas so that patients can have increased access to 
health care.” Marks, 319 S.W.3d at 686 (Guzman, J., concurring and 
dissenting) (citing a previous version of the statute). The uncertain line 
between premises liability and medical malpractice claims also means that 
premises liability insurance premiums could be adversely affected. Above all, 
continuing uncertainty will lead to increased litigation costs, forcing 
plaintiffs to procure multiple expert reports in cases involving no medical 
expertise or true health care related claims.
            
Because the Court’s decision will spawn uncertainty and extend health 
care liability claim treatment to claims that are not “inseparabl[y] and integral[ly]” 
related to the rendition of medical services, Marks, 319 S.W.3d at 664, 
without regard to legislative intent, I am compelled to respectfully express my 
dissent.
 
                                                                        
___________________________________
                                                                        
Debra H. Lehrmann
                                                                        
Justice
 
OPINION 
DELIVERED: July 1, 2011