JOHNSON COUNTY, IOWA, Plaintiff,

v.

JOHNSON CONTROLS,
INC., Defendant.

No. 3:14–cv–00022–JEG–CFB

United States District Court,
S.D. Iowa, Davenport Division.

Signed February 18, 2015

Mark W. Thomas, Michael C. Kuehner, Grefe & Sidney PLC, Des Moines, IA, for Plaintiff.

Keith James Larson, Christopher Lee Bruns, Elderkin & Pirnie PLC, Cedar Rapids, IA, Nicholas J. Kilburg, Pickens Barnes & Abernathy, Cedar Rapids, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Chief Judge, U.S. DISTRICT COURT

Currently before this Court is a Motion for Summary Judgment by Defendant Johnson Controls Inc. (JCI). ECF No. 9. Plaintiff Johnson County, Iowa (Johnson County) resists. The parties did not request a hearing, and the Court finds a hearing is not necessary for the resolution of this Motion. The Motion is fully submitted and ready for disposition.

## I. BACKGROUND

### A. Factual Background[1]

In late December 2012, a water line at the Johnson County, Iowa SEATS[2] building froze and burst, causing documents stored at the facility to get wet and damaged. Johnson County alleges JCI was negligent in installing and programming a temperature and CO monitoring system and seeks to recover damages from JCI for the cost to dry and restore the wet documents.

JCI programmed and installed the controls for the heating, CO monitoring, and ventilation system in the SEATS building. This system is known as the "louver control system." The engineer for JCI who set the system's order of operations and completed the commission was Victor Amoroso. The system was programmed to automatically open and close roof vents and run exhaust fans to control the temperature and CO levels in the building. The system included a CO monitor and two temperature sensors in each part of the building. When a temperature sensor signaled a high temperature, the system was programmed to open the vents and run the fans until the temperature lowered to a specified level. The system would automatically shut down the fans and close the vents once the temperature cooled. In a low-temperature situation, the vents and fans would not activate unless there was a CO alarm or a manual override. The CO sensors were programmed to activate two levels of CO alarms. A level 1 CO alarm would signal an audible alarm from the sensor, and the system would send an alarm notification to an office computer. A level 1 CO alarm would not control the vents or fans. If a higher amount of CO was detected, a level 2 CO alarm would cause the system to automatically open the roof vents and turn on the fans to exhaust any air contaminated with CO. In the event of a level 2 CO alarm, the vents were programmed to remain open and the fans would remain running until the system was manually reset. The system also included a manual override switch—known as the "mushroom switch"—which allowed a person to manually open the vents and run the fans. If the mushroom switch was activated, the system was required to be reset to shut down the fans and close the vents.

---

1. The facts set forth are either undisputed or viewed in the light most favorable to the nonmoving party, and the Court affords that party all reasonable inferences. *See Lexicon. Inc. v. ACE Am. Ins. Co.,* 634 F.3d 423, 425 (8th Cir.2010); *O'Neil v. City of Iowa City, Iowa,* 496 F.3d 915, 916 n. 1 (8th Cir.2007).

2. "The SEATS department provides rides to senior citizens, people with disabilities, and others who may otherwise find it difficult to conduct daily transactions." *SEATS Paratransit,* Johnson County, Iowa, www.johnson-county.com/dept_seats.aspx?id=581 (last visited Feb. 18, 2015).

In commissioning the system, Amoroso tested the sensors and controls and ensured the system was performing in line with the specified order of operations. After JCI completed the system in October 2009, it was turned over to the control of Johnson County. Johnson County did not retain JCI to maintain, inspect, or calibrate the system. JCI provided a one-year warranty on the system.[3] There is no evidence of any performance issues with the system from the time JCI completed the commission until late December 2012 when the incident at issue took place.

On Monday, December 31, 2012, at approximately 8:51 a.m., Eldon Slaughter, the facilities manager for Johnson County, entered the SEATS building and observed a low-temperature alarm in the north bay of the building. Slaughter then discovered a broken water pipe. Water was bursting from the pipe, causing water damage to the documents stored in that area. Slaughter testified that when he discovered the broken pipe, the exhaust fans were running and the roof vents were open.

It is unknown how and why the vents and fans activated sometime between December 27 and 31. The system was equipped with an alarm log to store a history of temperature and CO alarms. However, the alarm log has a limited history, and it overwrites older alarms after the system reaches its storage capacity. The alarm log was not viewed until a post-incident inspection in March 2012 in which a JCI employee photographed the available records with his cell phone. The oldest log viewable from the photo is a low-temperature alarm that occurred on December 27, 2012. Therefore, it is unclear whether the system was activated by a CO alarm, mushroom switch, or a malfunction prior to the temperature alarm on December 27. If the vents and fans were activated by a CO alarm or the mushroom switch prior to the December 27 low-temperature alarm, the system would have performed as intended. If the system did malfunction, there is no information available at this time to identify the nature of that malfunction because the system has not been tested.

Jack Palmer, Johnson County's technical expert, is of the opinion that the vents should not have been open and the fans should not have been running at and before the time the frozen pipe was discovered because there is no record of a CO alarm. Palmer concludes that the system malfunctioned. Palmer, however, did not test the system and is therefore unable to identify why or how the system malfunctioned or point to how JCI was negligent in installing and programming the system.[4]

Johnson County employees Eldon Slaughter and Shari Butler do not offer that any negligence by JCI in installing or programming the system caused the pipe to burst. Slaughter opined the pipe burst after sewer gas came up through a floor drain near a CO sensor and triggered a

---

3. There is no claim for breach of warranty.

4. Q: And you're able to tell me that you don't think those things should have happened, but you can't tell me was the system designed incorrectly, was there a component that malfunctioned, was there a component that was installed incorrectly? You can't tell me why the system malfunctioned, you can just tell me that the system malfunctioned, correct?

A: Correct.

Q: And I'm looking for you to tell me in what way [JCI] failed to exercise reasonable care. Are you able to tell me any ways that my client failed to exercise reasonable care?

A: Well, no, I can't, because I would need to sit down with them and ask the questions you're asking me ... did you test the CO monitor, did you trick thermostats, you know, yada, yada, I mean—and on and on.

Dep. of John T. Palmer 41–42, Def.'s App. 21–22, ECF No. 14–2.

level 2 CO alarm, causing the vents to open and the fans to run. Slaughter is not able to identify anything that went wrong with the system to cause the incident, nor is he able to discern anything that JCI should have done differently to prevent the incident. Butler, the maintenance supervisor for Johnson County who has the primary responsibility for the SEATS building, testified that JCI had nothing to do with the cause of the pipe burst. Butler notes that Johnson County does not have a service contract with JCI for the maintenance of the system.

Amoroso testified that it is his opinion that it is not possible that the incident occurred because of any negligence by JCI in designing, programming or installing the system. Amoroso opines the most likely explanation would be that one or more components malfunctioned because of Johnson County's failure to properly maintain and calibrate the system.

Mark Mason, a JCI employee who has extensive experience servicing, trouble shooting, and supervising the service of similar systems, testified that it is his opinion that it is impossible that the system malfunctioned because of any error by JCI. Mason notes that if a level 2 CO alarm was signaled on December 27 and the condition was not discovered until December 31, the system operated as intended. Mason also suggests that the vents and fans could have been manually activated by the mushroom switch. Absent a level 2 CO alarm or manual activation, Mason offers that the system may have malfunctioned. Mason does not have sufficient information to identify the nature of any malfunction but opines it would likely have been caused by a false alarm from an CO sensor. Mason notes that the CO sensors were supposed to be calibrated yearly and Johnson County failed to do so.

## B. Procedural Background

Johnson County filed this suit against JCI on January 24, 2014, in the Iowa District Court for Johnson County alleging a single claim for common law negligence. JCI properly removed the case to this Court on February 13, 2014, pursuant to diversity jurisdiction, 28 U.S.C. § 1332.

JCI filed this Motion for Summary Judgment on November 21, 2014. JCI argues that Johnson County has failed to present any evidence of negligence on the part of JCI. JCI argues that at most, Johnson County has produced evidence that the system may have malfunctioned. JCI argues, however, that evidence of a possible malfunction is not evidence of negligence in the installation or programming of the system. JCI contends the evidence contains admissions from Johnson County employees Slaughter and Butler that JCI is not at fault; JCI employees Amoroso and Mason testified that it was not possible for the incident to have been caused by JCI's negligence; and Palmer, Johnson County's expert, can only come to the conclusion that the system malfunctioned and cannot indicate the way or ways in which JCI failed to exercise reasonable care. In addition to arguing Johnson County cannot show JCI failed to use reasonable care, JCI further argues that Johnson County cannot show that any negligence by JCI was the cause in fact of the incident.

Johnson County filed its resistance on December 17, 2014. Johnson County argues there are genuine issues of material fact precluding summary judgment as to whether JCI was negligent and whether such negligence was the cause in fact of the damages claimed. Johnson County asserts that the summary judgment record is undisputed that if the system was operating properly, the vents should not have opened and the fans should not have oper-

ated without a level 2 CO alarm or manual activation. Johnson County contends that when Slaughter arrived on the morning of December 31, 2012, he observed a low-temperature alarm, the vents were open and fans were running, there was no CO alarm, and manual activation is precluded by the fact that no one entered the building from December 27 until Slaughter arrived on the morning of the incident. Johnson County argues that a reasonable juror could find from those facts that JCI was negligent in programming the system. Johnson County contends they are not required to provide expert testimony as to how JCI was negligent in installing and programming the system. Johnson County argues the issue of causation is a question for the jury.

## II. DISCUSSION

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. 323 (1986). The movant must support its contention by pointing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to demonstrate that no genuine issue of material fact exists. Fed. R.Civ.P. 56(c)(1)(A). The Court "must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party." *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir.2009) (quoting *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir.2007)).

To defeat summary judgment, the non-movant must respond by "produc[ing] sufficient evidence to support a verdict in his favor based on more than speculation, conjecture, or fantasy." *Doe v. Dep't of Veterans Affairs*, 519 F.3d 456, 460 (8th Cir. 2008) (citation and quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. 252 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and quotations omitted).

Johnson County only pleads a single state law claim for common law negligence. Under Iowa law, "[a]n actionable claim of negligence requires 'the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.'" *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (quoting *Stotts v. Eveleth*, 688 N.W.2d 803, 807 (Iowa 2004)). Plaintiff must "identify either a certain thing the allegedly negligent party did which that party should not have done, or a certain thing that party omitted that should have been done, under the legal theory of negligence that is applicable." *Coker v. Abell–Howe Co.*, 491 N.W.2d 143, 151 (Iowa 1992). "Negligence must be proved, and '[t]he mere fact that an accident ... has occurred, with nothing

more, is not evidence. . . .' " *Brewster v. United States,* 542 N.W.2d 524, 528 (Iowa 1996) (citation omitted).

Johnson County supports its claim of negligence through the testimony of its technical expert, Jack Palmer. Palmer indicates that if the system was operating as programmed, the vents and fans should not activate in a low-temperature setting unless the system receives a level 2 CO alarm or the system was activated manually. Palmer ultimately concludes the system malfunctioned; however, he acknowledges he did not test the system and is therefore unable to explain why the system malfunctioned or what JCI did or failed to do to cause the system to malfunction.

Johnson County cites *Schlader v. Interstate Power Company,* 591 N.W.2d 10 (Iowa 1999), for the broad proposition that it is not required to provide expert testimony showing how and why JCI was negligent in installing and programming the system. In *Schlader,* dairy farmers brought claims against an electric utility company alleging stray voltage injured the plaintiffs' dairy cow herd. *Id.* at 11. The Iowa Supreme Court found expert testimony was not necessary for plaintiffs to succeed on their claim. *Id.* at 14. The court explained that expert testimony "is not necessarily required merely because a case involves matters of science, special skill, special learning, knowledge, or experience which may be difficult for jurors to comprehend." *Id.* at 14. The court cited *Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), for the proposition that expert testimony is not necessary

> if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are

witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

*Id.* at 14 (quoting *Salem,* 370 U.S. at 35, 82 S.Ct. 1119). The court held that the plaintiffs were not required to present expert testimony on their claim because "the nature of electricity and the results of contact with it by humans and animals is not beyond a common person's understanding." *Id.* The court acknowledged that stray voltage "has been addressed by many courts including [the Iowa Supreme Court]; the concept is not new." *Id.* at 12. After determining the plaintiffs' claim did not require expert testimony, the court held the record contained sufficient evidence to survive summary judgment. *Id.* at 14. The plaintiffs had presented evidence that stray voltage was on their farm; that after the energy company installed isolator blocks, the voltage on the farm decreased; and a veterinarian testified that the herd's health problems were related to the voltage. *Id.*

 Johnson County's claim is readily distinguishable from *Schlader,* While Johnson County's claim has been asserted in simple negligence in regard to installing and programming the louver control system, the record indicates it is more in the nature of the theory of professional negligence against JCI in engineering, installing, and programming the system. *See Schiltz v. Cullen–Schiltz & Assoc., Inc.,* 228 N.W.2d 10, 17 (Iowa 1975) (recognizing professional negligence against engineers). JCI is a professional engineering firm, and the applicable standard of care should be measured by the degree of skill and care ordinarily possessed by members of that profession in similar circumstances. *Id.* As *Schlader* explains, under Iowa law, "[e]xpert testimony is required in actions based upon the negligence of a profession-

al." 591 N.W.2d at 14; *see also Garr v. City of Ottumwa*, 846 N.W.2d 865, 872 (Iowa 2014) ("[W]hen the connection between the defendant's negligence and the plaintiff's harm is not within the layperson's common knowledge and experience, the plaintiff needs expert testimony to create a jury question on causation." (citations and quotations omitted)). Johnson County's expert, Jack Palmer, is unable to explain how or why JCI was negligent in installing and programming the system because he did not test or evaluate the system. *See Garr*, 846 N.W.2d at 872–73 (holding that because there was no expert testimony on causation the evidence was insufficient). Accepting *arguendo* that the claim is not one of professional negligence but of simple negligence, the Court concludes the *Schlader* case is unhelpful because unlike stray voltage, the engineering, installation, and programming of the louver control system does not meet the *Salem* standard, making expert testimony unnecessary. It is not enough in this record to base a claim of negligence on the mere fact that the system did not perform as intended.[5]

■■■ Further, the Court must find Johnson County has failed to present sufficient evidence for a reasonable juror to conclude that JCI was negligent in installing and programming the system. It is undisputed the system did not malfunction from the time it was installed in October 2009 until the incident occurred in late December 2012. Johnson County acknowledges that it retained exclusive control over the system after it was installed and it did not contract with JCI to maintain, inspect, or calibrate the system. The system records were not preserved, and it is therefore now impossible to determine whether a CO alarm or mushroom switch activated the vents and fans prior to the December 27 low-temperature alarm.

Even assuming for purposes of this motion that the system malfunctioned, the summary judgment record contains no evidence explaining how and why JCI was negligent in installing and programming the system, and how JCI's alleged negligence caused the system to malfunction. JCI engineers Amoroso and Mason testified that it is not possible for the alleged malfunction in December 2012 to be caused by any negligence of JCI in installing and programming the system in October 2009. Johnson County employees Slaughter and Butler also testified that it is their opinion that the incident did not occur because of some negligence by JCI in installing and programming the system.

Taking every legitimate inference from the evidence in favor of Johnson County, the Court finds no reasonable juror could find JCI negligent on either a professional negligence or simple negligence theory. Accordingly, the Court must grant JCI's Motion for Summary Judgment.

## III. CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment, ECF No. 9, must be **GRANTED**.

**IT IS SO ORDERED.**

---

5. *See* discussion at pp. 916–17, *supra*.