**NATIONWIDE AGRIBUSINESS,
as subrogee of Tri Oak
Foods, Plaintiff,**

v.

**STRUCTURAL RESTORATION,
INC., Defendant.**

No. 3:08–cv–47 RP–CFB.

United States District Court,
S.D. Iowa,
Davenport Division.

April 13, 2010.

Kevin J. Driscoll, Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC, Des Moines, IA, S. Ellyn Farley, James I. Tarman, Jr., Cozen Oconnor, Chicago, IL, for Plaintiff.

Mark D. Aljets, Nyemaster Goode West Hansell & O'Brien PC, Des Moines, IA, Moss & Barnett, P.A., Minneapolis, MN, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendant Structural Restoration, Inc.'s ("SRI") Motion for Summary Judgment (Clerk's No. 27) and Plaintiff Nationwide Agribusiness's ("Nationwide") Motion for Partial Summary Judgment (Clerk's No. 31), both filed on November 13, 2009. Nationwide filed its Response to SRI's Motion for Summary Judgment on December 18, 2009. Clerk's No. 39. SRI also filed its Response to Nationwide's Motion for Partial Summary Judgment on December 18, 2009. Clerk's No. 37. Both parties filed their Replies on January 4, 2010. Clerk's Nos. 42, 43. The Court does not believe oral argument will materially aid it in resolving the present motions. The matters are fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This controversy relates to the collapse of a grain silo owned by Tri Oak Foods, formerly known as Oakville Grain, (hereinafter "Tri Oak") at Tri Oak's Oakville, Iowa facility (hereinafter "Oakville facility") on October 26, 2006. Def.'s Facts ¶¶ 2, 22; Pl.'s Facts ¶ 2. Prior to the collapse, the Oakville facility had four grain storage silos that Tri Oak used to store grain for the purpose of feeding hogs. Def.'s Facts ¶ 2. The silo that eventually collapsed was the smallest of the four silos and was known as the "wet tank" because it was used to receive wet corn from farmers. *Id.*

Many of the facts surrounding the events relevant to the current dispute are unclear. The following, however, is undisputed. In March or April 1997, Tri Oak hired SRI to inspect one of the large concrete silos (hereinafter "Silo 1"), not the wet tank, at the Oakville facility and to provide a quote for restoration of Silo 1. *Id.* ¶ 5. On or about April 14, 1997, SRI and Tri Oak entered into a written contract to perform the inspection. *Id.* ¶ 6. SRI sent three employees to perform the inspection, which consisted of the following: (1) scaffolding was erected around the silo to inspect its interior and exterior surface; (2) a sound test was performed on all surfaces to locate and identify any delaminations;[1] (3) the delaminations were marked for future reference in performing the necessary repairs; and (4) the strength of the concrete was tested with a destructive impact hammer. *Id.* ¶ 7. Tri Oak requested a less thorough, visual inspection of the exteriors of three other silos, including the wet tank, for noticeable cracks or spalls[2] that would need repair. *Id.* ¶ 8. SRI provided a report to Tri Oak that outlined its findings and submitted a bid for the necessary repairs. *Id.* SRI's bid was not accepted, but Tri Oak did have Silo 1 repaired by someone else. *Id.*

The parties also agree that Charles Threet ("Threet"), an SRI employee, again visited the Oakville facility in 2003, but the

---

1. Merriam–Webster's Online Dictionary defines delamination as "separation into constituent layers." *Available at* http://www.merriam-webster.com/dictionary/delamination (last visited April 12, 2010).

2. Spall is defined as "a small fragment or chip especially of stone" by the Merriam–Webster's Online Dictionary. *Available at* http://www.merriam-webster.com/dictionary/spall (last visited April 12, 2010).

facts surrounding that visit are much less clear. Pl.'s Facts ¶ 7. Steve Cummings ("Cummings"), the then-grain operations manager at the Oakville facility, testified that he does not recall the specifics of Threet's 2003 visit or receiving a subsequent letter from Threet. Def.'s Facts ¶¶ 4, 9, 10; Pl.'s Resp. to Def.'s Facts ¶¶ 9, 10; *see also* Def.'s App. at 68. Cummings only vaguely recalls that there were conversations in which Threet said that he would like to stop by to check the repair work on Silo 1. *Id.*

Threet's recollection of his 2003 interaction with Tri Oak differs slightly from Cummings' memories. Threet recalls that he received a phone call from Tri Oak about the safety conditions of Silo 1. Def.'s App. at 82–83. Though Threet is uncertain if Cummings made this initial call in 2003, he is certain that he spoke to Cummings before stopping by the Oakville facility to look at Tri Oak's silos. *Id.* Threet also recalls that in December 2003, when he was traveling near Tri Oak, he stopped and made a visual inspection of the four silos. *Id.* Threet remembers that he looked closely at Silo 1 and also walked around the other silos. *Id.* He looked for, but did not observe, any bulges or exposed rebar as he walked around the silos. *Id.* at 83, 88. Following his visit, Threet wrote the following letter to Tri Oak on SRI letterhead:

20 December, 2003

Tri Oak Foods

# 1 Russel St.

Oakville, IA 52646

ATTN: Steve Cummings

Ref: INSPECTION

SILOS: 1, 2, 3, AND 4

The above referenced silos were first inspected by Structural Restoration, Inc. during March 1997. The following conditions were observed:

MARCH 1997

1. In the surface concrete of silo number 1, 12,000 S.F. of delaminations were identified. Repairs were completed by others in accordance with specifications ACI 506 SHOTCRETE.

2. Minor cracks were visually observed in silos 2, 3, & 4. No delaminations were identified.

DECEMBER 2003

1. The repairs completed to silo number 1 show no identifiable failures and no new delaminations were noted.

2. I have compared notes and photographs of silos 2, 3, & 4 and surface conditions are believed unchanged.

Notes:

1. During our original inspection, the surface cracks did not penetrate the total wall thickness.

2. Surface cracks can be expected in grain storage systems. This condition is expected due to no movement joints being included in the silo design.

3. I find the silos acceptable for grain storage service.

4. I recommend a visual inspection being made every 3 to 5 years.

Sincerely,

STRUCTURAL RESTORATION INC.

Charles T. Threet

Estimator & Field Manager

copy:

Randy Pflum [3]

Def.'s App. at 49–50 (hereinafter "December 20, 2003 Letter").

Neither Cummings nor Randy Pflum ("Pflum"), Tri Oak's CEO, could identify why a copy of the December 20, 2003

---

3. The telephone and fax numbers for Cummings and Randy Pflum are omitted.

Letter was sent to Pflum. Def.'s Facts ¶ 11. In addition, Pflum has no recollection of the December 20, 2003 Letter until it was shown to him by a Nationwide adjuster, Mark Whalen, after the collapse of the wet tank. *Id.*

The parties agree that SRI was not paid by Tri Oak for Threet's 2003 visit and the December 20, 2003 Letter. *Id.* ¶ 18. Threet recalls that his primary purpose in visiting the Oakville facility was to "look[ ] for work for the next year," and he describes the December 20, 2003 Letter as a "sales tool." Def.'s App. at 83–84.

Though neither Threet, Cummings, nor any other employee of SRI or Tri Oak recall the details of the interaction that lead to Threet's 2003 visit and December 20, 2003 Letter, the record contains a letter, dated November 11, 2003, that may provide some context for Threet's 2003 visit and the December 20, 2003 Letter. Def.'s App. at 59 (hereinafter "November 11, 2003 Letter"). The November 11, 2003 Letter is putatively from Nationwide, is addressed to Cummings, and conveys the results of a "loss control service" that identified one recommendation: "Critical: Have a Structural Engineer come and look at [Tri Oak's] four STAR silos and have him give a report on their structural soundness. We have had problems with collapse on these silos throughout the midwest [sic] and we want to make sure yours are structurally sound." Def.'s Facts ¶¶ 12–14; Def.'s App. at 59. Below this recommendation is an area for Cummings' response. Def.'s App. at 59. In that area, the box indicating that "All conditions identified in the recommendations will be completed by (Date)" is checked, though there is a question mark on the line where the "Date" would have been indicated. *Id.* Next to the question mark, a hand written

note states: "I have called a structural engineer[,] Chuck Threet[,] Structural Restoration[,] Mnpls, Mn (See card). He is sending an engineer to look at the silos and give us a Bid. Waiting on the Bid to see when project...."[4] *Id.* The November 11, 2003 Letter is signed by Cummings and dated November 11, 2003. *Id.* Attached to the November 11, 2003 Letter was Threet's SRI business card, listing his title as "Estimator." *Id.* at 60.

The parties agree that SRI's December 20, 2003 Letter was forwarded to Nationwide by Tri Oak to satisfy Nationwide's requirement that Tri Oak hire an engineer to inspect the silos prior to Nationwide providing collapse coverage, though it is unclear who at Tri Oak handled this paperwork. Def.'s Facts ¶ 21. Nationwide then relied on the December 20, 2003 Letter when it renewed Tri Oak's insurance policy that provided collapse coverage for the silos. *Id.*; Pl.'s Facts ¶ 10.

The wet tank subsequently collapsed in October 2006. Pl.'s Facts ¶ 11. A post-collapse inspection of the wet tank commissioned by Nationwide concluded that: (1) "the cause of the failure was corrosion of hoop re-bars at the hoop welds"; (2) "this is a result of long term related deterioration of the re-bar"; and (3) "[s]ince the re-bar is embedded in the concrete, a visual inspection would probably not show the corrosion unless cracks were visible that showed the re-bar. It is understood that no such visible cracks were found." Def.'s App. at 54.

Nationwide has made payments to Tri Oak for the damages sustained as a result of the collapse in the net amount of $1,026,330.01. Pl.'s Facts ¶¶ 11–13; Am. Compl. ¶ 21. Nationwide filed the present action against SRI, as a subrogee of Tri Oak, alleging claims of: (1) negligence; (2)

---

4. The remainder of the handwritten note is obscured in the photocopy submitted to the Court. *See* Def.'s App. at 59.

breach of express oral and/or implied contract; and (3) breach of express, oral and/or implied warranties. Am. Compl. ¶¶ 23–42. Before the Court are the parties' cross motions for summary judgment: SRI seeks summary judgment in its favor on all three counts, and Nationwide requests partial summary judgment in its favor on the issue of liability as to all three counts. *See* Clerk's Nos. 27, 31.

## II. STANDARD OF REVIEW

"A party against whom relief is sought may move at any time … for summary judgment on all or part of the claim." Fed.R.Civ.P. 56(b). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and designate specific facts by affidavits or by the depositions, answers to interrogatories, and admissions on file, showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he

mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In the present case, both sides have moved for summary judgment on the Plaintiff's claims. Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2712 (3d ed. 1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Township Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no

dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank,* 370 F.3d 164, 170 (1 st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.,* 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson,* 182 F.Supp.2d 765, 769 (N.D.Iowa 2001).

### III. LAW AND ANALYSIS

As noted, Nationwide asserts the following claims against SRI as a subrogee of Tri Oak: (1) common law negligence, in the form of negligent misrepresentation; (2) breach of contract; and (3) breach of warranty. SRI argues that each of these claims cannot survive summary judgment for numerous reasons. Nationwide disputes each of SRI's arguments and counters in its own Motion that it is entitled to summary judgment regarding liability on each of its claims. The Court addresses each of the parties' arguments in turn.

#### A. *Negligence Claim*

■ "An actionable claim of negligence includes the existence of a duty to conform

to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Stotts v. Eveleth,* 688 N.W.2d 803, 807 (Iowa 2004) (internal quotation marks and citation omitted). Nationwide asserts that SRI committed actionable negligence by negligently inspecting the wet tank and by negligently misrepresenting the results of its inspection of the Tri Oak silos in the December 20, 2003 Letter. Pl.'s Resp. Br. to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Resp. Br.") at 4. Nationwide argues that the facts in the record establish as a matter of law that SRI was negligent when it provided Tri Oak with an inaccurate inspection report, and thus, it is entitled to summary judgment as to SRI's liability. SRI, on the other hand, argues that flaws exist in Nationwide's negligence claim with respect to the elements of duty, the standard of care, and causation, each of which require summary judgment in favor of SRI. The Court begins by addressing SRI's arguments.

1. *SRI's arguments for summary judgment in its favor.*

a. *Did SRI owe Tri Oak a duty with respect to the 2003 inspection?*

█ SRI first argues that Nationwide has failed to establish the existence of a legal duty owed by SRI to Tri Oak because "there is no special or contractual relationship between SRI and Tri Oak," because SRI is not in the business of providing information to others, and because SRI was not paid for the December 20, 2003 Letter. Def.'s Br. in Supp. of Mot. for Summ. J. at 11, 15–16.[5] Nationwide counters that "a negligently prepared report can, without question, be the basis for an action when a party relies upon it in making business decisions." Pl.'s Resp. Br. at 5.

█ "The existence of a legal duty is a question of law." *Kolbe v. State,* 661 N.W.2d 142, 146 (Iowa 2003). "A legal duty 'is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons.'" *J.A.H. v. Wadle & Assocs.,* 589 N.W.2d 256, 258 (Iowa 1999) (quoting *Sankey v. Richenberger,* 456 N.W.2d 206, 209 (Iowa 1990)). "[I]n negligence cases the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk.... [I]t should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the

---

**5.** SRI presents its arguments disputing the existence of a duty of care under two different subheadings: "Negligence" and "Negligent Misrepresentation." Def.'s Br. in Supp. of Mot. for Summ. J. at 11–16. Nationwide, however, constructs its negligence claim as a single negligent misrepresentation claim that properly encompasses both the possibility of negligent inspection as well as negligent communication of the inspection's conclusions. *See* Pl's Br. in Supp. of Mot. for Summ. J. at 3–12; Pl.'s Resp. Br. at 4–9; *see also* Restatement (Second) of Torts § 522 cmt. f ("If the matter is one that requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his statement is based. He must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information. He must exercise reasonable care and competence in communicating the information so that it may be understood by the recipient, since the proper performance of the other two duties would be of no value if the information accurately obtained was so communicated as to be misleading."); *cf.* Restatement (Second) of Torts § 311 cmt. d (noting that an actor's "negligence may consist of failure to make proper inspection or inquiry, or of failure after proper inquiry to recognize that the information given is not accurate").

particular plaintiff is entitled to protection." *Larsen v. United Fed. Sav. & Loan Ass'n of Des Moines,* 300 N.W.2d 281, 285 (Iowa 1981) (quoting W. Prosser, *Handbook of the Law of Torts* § 53, at 324–26 (4th ed. 1971)). In determining whether there is a legal duty, Iowa courts consider: "(1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person who is injured; and (3) public policy considerations." *Kolbe,* 661 N.W.2d at 146.

When determining whether a legal duty arises when a party asserts a claim for negligent misrepresentation, the Iowa courts regularly rely on the Restatement (Second) of Torts § 552(1), which provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See, e.g., Freeman v. Ernst & Young,* 516 N.W.2d 835, 837 (Iowa 1994) ("In Iowa the tort of negligent misrepresentation finds its genesis in section 552 of the Restatement (Second) of Torts."); *Larsen,* 300 N.W.2d at 287 (relying on § 552 to find that a lender's negligent appraisal report could furnish the basis for a negligence suit by home buyers who relied on the report to their detriment); *cf. Sain v. Cedar Rapids Cmty. Sch. Dist.,* 626 N.W.2d 115, 123 (Iowa 2001) (noting that courts have not found a need to treat negligent misrepresentation as a cause of action distinct and separate from a negligence claim "when the conduct has caused personal injury or property damage," but that "when misrepresentation based on negligent acts results solely in an interference with intangible economic interests, more restrictive rules of recovery have been developed").

The Iowa Supreme Court recently provided a thorough discussion of the duty of care imposed under § 552 of the Restatement in *Sain v. Cedar Rapids Community School District,* where it considered whether a school counselor had a duty to a student to use reasonable care in providing course information regarding student eligibility to participate in college athletics. 626 N.W.2d at 124–28. The *Sain* court began by noting:

> In the context of negligent misrepresentation, ... the person who supplies the information must owe a duty to the person to whom the information is provided. Although § 552 of the Restatement supports a broader view, we have determined that this duty arises only when the information is provided by persons in the business or profession of supplying information to others.

*Id.* at 124. In considering the relationship between the parties, the *Sain* court observed that, when a person is in the business or profession of supplying information to others, the nature of the relationship justifies the imposition of a duty on the person supplying the information because "a transaction between a person in the business or profession of supplying information and a person seeking information is compatible to a special relationship." *Id.* In regard to foreseeability, the *Sain* court explained:

> [A] person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose. Such a person is also in a position to weigh the use for the information against the magnitude and

probability of the loss that might attend the use of the information if it is incorrect. Under these circumstances, the foreseeability of harm helps support the imposition of a duty of care.

*Id.* at 124–25 (internal citations omitted). Finally, the *Sain* court found that policy considerations favor imposing a duty on a person who is in the business or profession of supplying information because of the pecuniary interest that person has in the business or profession. *Id.* at 125. Thus, the Iowa Supreme Court concluded where it began its discussion, with the observation that "[its] approach in the application of the tort of negligent misrepresentation has been to consider the facts of each case to determine if the defendant is in the business or profession of supplying information to others." *Id.*

Here, SRI asserts that it is in the business of making necessary repairs to concrete and masonry structures. Def.'s Br. in Supp. of Mot. for Summ. J. at 16. However, the fact that part of SRI's business is repair work does not foreclose the possibility that it is also in the business of supplying information to others. Indeed, it is undisputed that SRI also performs inspections, such as the inspection of Tri Oak's silos that SRI performed in 1997. *See* Pl.'s Resp. to Def.'s Statement of Material Facts ¶¶ 5–8. The preparation of an inspection report by one business for another business is a classic instance of one being "in the business of supplying information to another." *See, e.g., Burbach v. Radon Analytical Labs., Inc.,* 652 N.W.2d 135, 138 (Iowa 2002) (holding that a home inspection company could be liable for negligent misrepresentation); *Ryan v. Kanne,* 170 N.W.2d 395 (Iowa 1969) (finding that an accountant who is hired to prepare statements regarding the financial health of a business is within the ambit of section 552 of the Restatement (Second) of Torts). Thus, the Court concludes that a portion of SRI's business is the provision of information to others.

■ Moreover, the Court is not persuaded by the several cases cited by SRI for the proposition that SRI should be excluded from the legal duty imposed under § 552 of the Restatement. *See* Def.'s Br. in Supp. of Mot. for Summ. J. at 16. "[W]hen deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, [Iowa courts] distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Sain,* 626 N.W.2d at 124. Each of the cases cited by SRI concern transactions in which the parties were dealing at arm's length and the alleged misinformation was incidental to the arm's length transaction. *See Molo Oil Co. v. River City Ford and Truck Sales, Inc.,* 578 N.W.2d 222, 227 (Iowa 1998) (holding that the seller of a used semi-truck was not in the business of providing information and the transaction was a commercial, arm's length transaction); *Haupt v. Miller,* 514 N.W.2d 905, 910 (Iowa 1994) (concluding that a claim against a bank officer involved in arm's length negotiations with a bank customer was not actionable); *Meier v. Alfa–Laval, Inc.,* 454 N.W.2d 576, 581–82 (Iowa 1990) (finding no cause of action for negligent misrepresentation against seller of retail merchandise); *Jacobs v. City of Iowa City,* No. 02–1849, 2004 WL 433738, at *4 (Iowa Ct.App. Mar. 10, 2004) (finding that former homeowners, who sold their home to plaintiffs, were not in the business of supplying information). In the present case, while SRI may have been hoping for a future business opportunity with Tri Oak, there is no evidence that SRI's inspection services in 2003 were incidental to any other, arm's

length transaction between SRI and Tri Oak.

SRI also asserts that it owed no duty to Tri Oak because it was not paid for the 2003 visit and letter. Again, the Court disagrees with SRI's constricted view of the legal duty placed on persons in the business of supplying information for the guidance of others. In *Sain*, the Iowa Supreme Court found that, even though the student did not pay for the alleged misinformation, "the counselor [wa]s paid by the school system to provide such advice, and has an indirect financial interest in providing the information." 626 N.W.2d at 126. Thus, the *Sain* court concluded that the information was not "gratuitous information that the counselor would not expect the student to rely upon." *Id.* The facts in the present case are analogous. Threet testified that he viewed the 2003 visit and December 20, 2003 Letter as a "sales tool" for SRI. While the immediate service was gratuitous, SRI had an indirect financial interest in performing an inspection and providing the information in the December 20, 2003 Letter. Given SRI's indirect pecuniary interest in providing its inspection services, especially in light of the previous paid inspection services SRI provided to Tri Oak, Tri Oak could be expected to rely on the subsequent inspection report, thus supporting the imposition of a legal duty to act with care when providing such information.[6]

While the facts surrounding the 2003 interaction between SRI and Tri Oak are hazy, Nationwide has presented undisputed evidence showing that part of SRI's business was to provide information in the form of inspection reports. Thus, the Court concludes that under Iowa negligent misrepresentation law, SRI owed Tri Oak a duty to exercise reasonable care when it provided Tri Oak with inspection information regarding the silos.

b. *Is there a requirement of expert testimony to establish the standard of care?*

■ SRI next argues that the standard of care in this case is so complex that expert testimony is necessary to establish "the standard of care that is required of one performing a visual inspection of a silo or the breach of such standard." Def.'s Br. in Supp. of Mot. for Summ. J. at 12. It asserts that since Nationwide has failed to disclose an expert regarding the professional standard for silo inspections, the negligence claim is "doom[ed]." *Id.* at 13. Nationwide counters that "[a] lay juror could easily make reasonable inferences from the facts and determine whether SRI committed actionable negligence in failing to conduct a more thorough inspection

---

6. In addition, Iowa has adopted the Restatement (Second) of Torts § 323, which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking to a

third person for negligent performance of undertaking.
*See Jain v. State,* 617 N.W.2d 293, 299–300 (Iowa 2000) (collecting cases). Since SRI's inspection of the silos and statement regarding the fitness of the silos for use was a service that is necessary to the protection of Tri Oak's property, and arguably the failure to properly inspect and report the conditions of the wet tank increased the risk that the wet tank would collapse and/or cause harm to a third person, the lack of payment does not foreclose the possibility of SRI's liability.

and/or by failing to include a statement disclaimer or warning.... " Pl.'s Resp. Br. at 9.

 In a negligent misrepresentation claim, "the defendant is subject to liability if, but only if, he has failed to exercise the care or competence of a reasonable [person] in obtaining or communicating the information." Restatement (Second) of Torts § 552 cmt. e. Iowa courts have held that, for certain causes of action, "proof of specific negligence on the part of a professional requires that the plaintiff introduce expert opinion testimony." *Eventide Lutheran Home for the Aged v. Smithson Elec. & Gen. Const., Inc.*, 445 N.W.2d 789, 791 (Iowa 1989) (citing *Forsmark v. State,* 349 N.W.2d 763, 768 (Iowa 1984)); *cf. City of Urbandale v. Frevert–Ramsey–Kobes, Architects–Eng'rs Inc.,* 435 N.W.2d 400, 402 (Iowa Ct.App. 1988) ("Specific negligence of a professional can be established through expert testimony showing a standard of care and its breach or through evidence showing a lack of care so obvious to be within the comprehension of a layperson such as an external injury to the body not being treated."). The majority of cases in which Iowa courts have required expert testimony to establish the requisite standard of care are complex, medical malpractice suits. *See Welte v. Bello,* 482 N.W.2d 437, 440–41 (Iowa 1992) (collecting cases). Less frequently, Iowa courts have required expert testimony in other professional malpractice cases. *See Humiston Grain Co. v. Rowley Interstate Transp. Co., Inc.,* 512 N.W.2d 573, 575 (Iowa 1994) (requiring expert testimony to prove a claim that an insurance agent overlooked the defendant's subrogation rights); *Karnes v. Keffer Overton Assoc., Inc.,* No. 00–0191, 2001 WL 1443512, at *1 (Iowa Ct.App. Nov. 16, 2001) (affirming summary judgment for the defendant because the plaintiff failed to provide expert testimony regarding the mechanics of stairway engineering). However, not all medical or professional malpractice suits require expert testimony; expert evidence is required only when "[a] layperson unaided by expert testimony could not say that in the ordinary course of events the [harm] would not have occurred if reasonable care had been used." *Welte,* 482 N.W.2d at 442 (quoting *Forsmark,* 349 N.W.2d at 769). Indeed, the Iowa Supreme Court has observed that "[c]auses of action which predicate recovery upon expert testimony are rare." *Schlader v. Interstate Power Co.,* 591 N.W.2d 10, 14 (Iowa 1999). In *Schlader,* the Iowa Supreme Court re-interated the rule that

> expert testimony is generally unnecessary and may be properly excluded: "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation."

*Id.* (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). Thus, the *Schlader* court held that "although expert testimony would clearly be helpful to fact finders" in claims that "involve[ ] matters of science, special skill, special learning, knowledge, or experience which may be difficult for jurors to comprehend," such as the stray voltage claim presented in *Schlader,* it is rarely "a condition precedent." *Id.*

The cause of action in this case is not one of professional malpractice, and the disputed matters do not turn on complex engineering principles. The central premise of Nationwide's negligent misrepresentation claim is that "SRI failed to describe the type of inspection it actually performed" and "failed to communicate the

parameters and reliability of its inspection in its report." Pl.'s Br. in Supp. of Mot. for Summ. J. at 6. Thus, the jurors will be asked to consider the disputed factual record regarding the 2003 visit and determine whether the statements that SRI made in the December 20, 2003 Letter regarding the visual inspection were negligent in light of the interactions between SRI and Tri Oak. As a general matter, no special training is required to understand what standard of care is required of one who is engaged in the business of inspecting other people's property and reporting the results of the inspection. Indeed, many lay jurors will be familiar with technical inspections, such as home and automobile inspections. While the disputed matters may touch on matters of special skill, the Court concludes that they are sufficiently within the common understanding of the typical juror that expert testimony is not a condition precedent to the claim. Thus, SRI is not entitled to summary judgment on the ground that Nationwide has not submitted expert testimony regarding the standard of care required for a visual inspection of a concrete silo.[7]

c. *Has Nationwide failed to present a jury question regarding causation?*

■ SRI also seeks summary judgment on the issue of causation, arguing that Threet was asked to look for "obvious changes" during his 2003 visit and, therefore, that Nationwide must submit evidence that the cause of the collapse was the result of an "obvious change" to proceed with its negligent inspection claim. Def.'s Br. in Supp. of Mot. for Summ. J. at 13. SRI points to evidence in the record from Nationwide's post-collapse failure analysis, stating that a visual inspection would not have uncovered the cause of the

collapse unless a crack uncovering the corroded rebar was present, and asserts that there is no evidence that such cracks were visible or present in 2003. *See id.* at 13–14.

Nationwide takes a broader view regarding the issue of causation, arguing that without the December 20, 2003 Letter, Tri Oak would not have been able to get the collapse insurance that allowed it to continue to use the wet tank, and that if SRI accurately reported the dangerous condition of the wet tank, Tri Oak would not have continued to use the wet tank. Pl.'s Resp. Br. at 7–8. Thus, Nationwide asserts that, but for the December 20, 2003 Letter, the wet tank would not have been in service, and further, that if there was a collapse while the wet tank was out of service, the damages would have been limited to the structure itself. *Id.*

■ The question of causation is ordinarily for the jury to decide; only in exceptional cases can it be decided as a matter of law. *Thompson v. Kaczinski,* 774 N.W.2d 829, 836 (Iowa 2009). Under Iowa law, Nationwide must prove two components to establish causation: (1) that SRI's conduct, in fact, caused Tri Oak's damages (a factual inquiry); and (2) that the policy of the law requires SRI to be legally responsible for the injury (a legal question). *Id.*

■ With respect to the factual inquiry, a plaintiff must show: "(1) that the harm would not have occurred but for the negligence of the defendant; and (2) that the negligence of the defendant was a substantial factor in bringing about the harm." *Rieger v. Jacque,* 584 N.W.2d 247, 251 (Iowa 1998). A plaintiff will meet his or her burden of proof when the evidence is

7. SRI does not provide an alternative argument that Nationwide has failed to present a triable question of fact regarding a breach of

the standard care. *See generally* Def.'s Br. in Supp. of Mot. for Summ. J.

"such as to make plaintiff's theory of causation reasonably probable, not merely possible, and more probable than any other theory based on such evidence. It is not necessary for the testimony to be so clear as to exclude every other possible theory." *Conn. Fire Ins. Co. v. Gusman,* 259 Iowa 271, 144 N.W.2d 333, 336 (1966). Here, the record regarding the condition of the wet tank and Tri Oak's use of the wet tank before and after the 2003 inspection is sparse. However, Nationwide has provided evidence that Tri Oak used the December 20, 2003 Letter to obtain collapse insurance, and that the insurer, Nationwide, relied on statements in the Letter when it issued the insurance policy. Nationwide proposes, and SRI does not dispute, that Tri Oak continued to use the wet tank because of the assurance in the December 20, 2003 Letter that it was suitable for service. While the jury's conclusion on the issue of factual causation is by no means certain, a reasonable jury could conclude that the alleged misrepresentations in the December 20, 2003 Letter were a "but for" cause of the losses incurred when the wet tank collapsed, and that they were a substantial factor in causing all or some of the losses incurred in the collapse of the wet tank.

■■■ Regarding the legal question of causation, which the Iowa courts now refer to as "scope of liability," the "issue is fact-intensive as it requires consideration of the risks that made the actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks." *Thompson,* 774 N.W.2d at 838. "Ordinarily, the question of proximate causation is for the finder of fact. It will be decided as a matter of law only in extraordinary cases." *Lovick v. Wil–Rich,* 588 N.W.2d 688, 700 (Iowa 1999) (internal citation omitted). Again, the Court notes that many of the facts that may bear on a jury's inquiry into the scope of liability are unsettled. For example, it is unclear whether SRI gave Tri Oak reason to believe that SRI could provide a structural engineer's inspection or whether SRI was aware, or should have been aware, that Tri Oak intended to use the report to satisfy an insurance reporting requirement. *See Sain,* 626 N.W.2d at 124–25 (observing that where a person is in the business of supplying information to others, and where that person is "aware of the use that the information will be put, and intends to supply it for that purpose," the harm from a misrepresentation is foreseeable). Viewing the facts in a light most favorable to Nationwide, a reasonable jury could find that the damages incurred from the collapse of the wet tank were among the range of harms that SRI risked when it provided Tri Oak with the December 20, 2003 Letter. *See Thompson,* 774 N.W.2d at 838. Thus, SRI is not entitled to summary judgment on the negligence claim based on the issue of causation.

### 2. Nationwide's Arguments for Summary Judgment in its favor.

■■■ Nationwide also moves for partial summary judgment on liability despite the fact that it has the burden of proof on each element of its negligence claim. "Summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998). As the Court has previously noted, the facts that surround SRI and Tri Oak's interactions in 2003 are less than clear. The present record does not conclusively show that the December 20, 2003 Letter contained a negligent misrepresentation that caused damage to Tri Oak. Instead, the evidence in the record raises questions regarding breach of duty and causation which require examination by a factfinder. *See* Iowa R. of App. P. 6.14(6)k ("The following propositions are deemed so well established that authorities need not be cited in support of any of them: ... Generally, questions of negli-

gence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law."). The Court cannot conclude that this is one of the extremely rare cases in which a plaintiff could be granted judgment as a matter of law on the issue of liability in a negligence claim.

## B. *Breach of Contract*

To prevail on its breach of contract claim, Nationwide must prove:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [Tri Oak] performed all the terms and conditions required under the contract; (4) [SRI's] breach of the contract in some particular way; and (5) that [Tri Oak] suffered damages as a result of the breach.

*Molo Oil Co.*, 578 N.W.2d at 224. SRI asserts that the record lacks sufficient facts to establish the existence of an oral contract.[8] Def.'s Br. in Supp. of Mot. for Summ. J. at 17. More specifically, SRI argues that Nationwide has failed to meet its burden to show that the terms of any agreement between SRI and Tri Oak were sufficiently definite to form an enforceable oral contract and that the alleged 2003 contract fails for want of consideration. *Id.* at 17–19. In addition, SRI asserts that Nationwide has failed to establish a breach of contract or a causal connection between any alleged breach and Tri Oak's damages. *Id.* at 19–20.

To prove the existence of an oral contract, Nationwide must show that the terms of the alleged oral contract are "sufficiently definite for a court to determine with certainty the duty of each party and the conditions relative to performance." *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999)

(citing *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 113 (Iowa 1991)); *see also In re Price*, 571 N.W.2d 214, 216 (Iowa Ct.App.1997) ("[F]or an oral contract to be found and enforceable, the terms must be so definitely fixed so that nothing remained except to reduce the terms to writing."). " '[A]n agreement need not contain definitely and specifically every fact in detail to which the parties may be agreeing.' ... The agreement need only be 'certain and unequivocal in its essential terms....' " *In re Price*, 571 N.W.2d at 216–17 (quoting 17A Am.Jur.2d *Contracts* § 197 (1991)). "Whether an oral contract existed, what its terms were, and whether it was breached ordinarily are questions for the trier of fact." *Dallenbach v. MAPCO Gas Prods., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990). "[A]ll minor details of the contract need not be proven in the first instance in order to present the issue for the trier of fact." *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 165 (Iowa Ct.App.1993) (citing *Fortgang Bros., Inc. v. Cowles*, 249 Iowa 73, 85 N.W.2d 916, 919 (1957)).

Nationwide asserts that it can establish the terms of an oral contract between SRI and Tri Oak based on the following facts: (1) Tri Oak was required to submit an engineering report to Nationwide; (2) there was communication between Tri Oak and SRI discussing SRI's 2003 visit to the Oakville facility; and (3) SRI visited the Oakville facility, performed a visual inspection, and wrote the December 20, 2003 Letter that contained an assurance that the silos were suitable for grain storage. Pl.'s Resp. Br. at 9–10. The Court does not agree that this evidence is sufficiently definite to determine with certainty the duty of each party and the conditions relative to performance.

---

**8.** Nationwide does not dispute SRI's assertion that there was no written contract for the 2003 inspection. *See* Def.'s Br. in Supp. of

Mot. for Summ. J. at 17; *see generally* Pl's Resp. Br. at 9–13.

As SRI notes, there is a lack of evidence in the record that would demonstrate that Tri Oak hired SRI. Moreover, it is disputed whether SRI, in fact, requested the 2003 inspection. The two persons who recall any discussions prior to the 2003 inspection, Threet and Cummings, were both unable to recollect any specific details regarding their discussions. None of the deposition testimony in the record indicates that SRI or Tri Oak discussed terms that could provide a basis for an enforceable agreement. Moreover, there is no evidence in the record, either in the form of deposition testimony or other writings, that would suggest that SRI and Tri Oak intended to enter into a contract regarding the 2003 visit and December 20, 2003 Letter. The lack of any written documentation regarding the 2003 inspection is in noticeable contrast to the 1997 letter from SRI to Tri Oak that set forth SRI's offer to inspect Silo 1, in which SRI described both the scope and price of the proposed inspection. *See* Def.'s App. at 46–47.

In total, the evidence in the record gives no indication of what would be the essential terms of an agreement between SRI and Tri Oak for SRI's inspection of the silos in 2003. Thus, even when the Court views the record in Nationwide's favor, the Court must conclude that Nationwide has not presented evidence from which a reasonable jury could conclude that an enforceable oral contract was formed. *See Schaller Tel. Co. v. Golden Sky Sys.*, 298 F.3d 736, 744 (8th Cir.2002) (applying Iowa law and noting that while the determination of whether an oral contract exists is ordinarily a question of fact, summary judgment is appropriate if "a party has not offered sufficient evidence to support the existence of a contract"). Accordingly, the Court finds that it is appropriate to grant summary judgment in favor of SRI on Nationwide's breach of contract claim

(Count III). Because the Court concludes that Nationwide failed to generate a triable issue of fact regarding the formation of an enforceable oral agreement, it does not reach SRI's alternative arguments that the breach of contract claim must fail for want of consideration and that Nationwide failed to demonstrate a breach or a causal link between a breach and Tri Oak's damages. In addition, given the Court's conclusion that Nationwide has not generated a triable issue of fact as to the formation of an enforceable oral agreement, it also logically follows that Nationwide is not entitled to partial summary judgment on the breach of contract claim.

## C. *Breach of Warranty*

SRI presents numerous arguments in opposition to Nationwide's breach of warranty claim. SRI first argues that because a breach of warranty claim is based in contract law, Nationwide's breach of warranty claim fails for the same reasons as the breach of contract claim, namely, for lack of definite terms, no consideration, and failure to show a breach or causation. Def.'s Br. in Supp. of Mot. for Summ. J. at 20–21. Nationwide provides no counterargument to this assertion.

The Iowa Supreme Court recently had occasion to observe that a breach of warranty claim is founded in contract law, not tort law. *Barnhill v. Iowa Dist. Court for Polk County*, 765 N.W.2d 267, 274 (Iowa 2009) (citing *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 107 (Iowa 1995)). Indeed, each of the cases that Nationwide relies on for the proposition that inspection services should not be exempted from the broad application of the implied warranty of workmanlike performance make clear that the implied warranty derives from a contractual relationship between a person who holds himself out to have specialized skills, and a purchaser of such services.[9]

9. SRI argues that Nationwide cannot establish a breach of express warranty claim be-

*See Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108, 111, 113 (Iowa 2008) (noting that "[t]he implied warranty of workmanlike construction is contractual in nature ...."); *Kirk v. Ridgway*, 373 N.W.2d 491, 495 (Iowa 1985) (recognizing an implied warranty of workmanlike construction in the sale of real estate when a house is purchased from a builder who, among other characteristics, "has ultimate responsibility for a completion of the whole contract"); *Meyer v. Nottger*, 241 N.W.2d 911, 921 (Iowa 1976) (concluding that the plaintiff presented sufficient material evidence from which a trier of fact could find the defendant breached "the implied promise to exercise proper skill and perform the contract obligations in a workmanlike manner"); *All E. Iowa Gutter, Inc. v. Dan's Overhead Doors & More, Inc.*, No. LACV 39685, 2003 WL 24054808, at *4-5 (Iowa Dist.Ct. Jan. 16, 2003) (considering the plaintiff's breach of contract claims within the context of two construction contracts between the parties).

 As discussed above, Nationwide has failed to present sufficient evidence to generate a jury question regarding the existence of an enforceable contract between SRI and Tri Oak. Because a breach of warranty claim must be grounded in a contractual relationship, Nationwide's breach of warranty claim must likewise fail. Thus, the Court concludes that SRI is entitled to summary judgment on the breach of warranty claim (Count II). Accordingly, the Court does not reach the

questions of whether Iowa common law recognizes an implied warranty of workmanlike performance in inspection services, or whether Nationwide established the essential elements required for such a claim. As with the breach of contract claim, Nationwide's failure to present a triable breach of warranty claim necessarily requires that the Court deny Nationwide's motion for partial summary judgment on that claim.

## IV. CONCLUSION

For the reasons stated herein, SRI's Motion for Summary Judgment (Clerk's No. 27) is GRANTED in part and DENIED in part. SRI is granted judgment as a matter of law with regard to the breach of warranty claim (Counts II) and breach of contract claim (Count III), but judgment as a matter of law is denied as to the negligence claim (Count I). Nationwide's Motion for Partial Summary Judgment (Clerk's No. 31) is DENIED.

IT IS SO ORDERED.

cause there is no evidence that SRI made any distinct expression of the quality or nature of its alleged inspection services. Def.'s Br. in Supp. of Mot. for Summ. J. at 21. Nationwide does not dispute this argument and does not put forward any arguments that SRI breached an express warranty. *See* Pl.'s Resp. Br. at 13–15. Instead, Nationwide limits its breach of warranty claim to the assertion that SRI breached an implied warranty to perform the inspection in a workmanlike manner. *Id.* Accordingly, the Court limits the scope of its discussion to the breach of implied warranty for workmanlike performance advanced by Nationwide.