# IN THE SUPREME COURT OF IOWA

No. 15–0164

Filed December 23, 2016

DINSDALE CONSTRUCTION, LLC,
     Appellee,

vs.

LUMBER SPECIALTIES, LTD.,
     Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Grundy County, Kellyann Lekar, Judge.

A construction materials manufacturer and provider of engineering services seeks further review of a court of appeals decision affirming the district court's denial of its motion for judgment notwithstanding the verdict finding liability for negligent misrepresentation. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Michael A. Carmoney and Allison J. Frederick of Carmoney Law Firm, PLLC, Des Moines, for appellant.

Chad A. Swanson and Nathan J. Schroeder of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee.

**CADY, Chief Justice.**

In this case, we must decide if an employee of a business that sells building materials and services who supplied false information to a builder about the structural integrity of a building under construction had a duty to use reasonable care in supplying the information when it was done as a courtesy to the builder and for the general goodwill of the business. Following a jury trial on claims for negligent misrepresentation and breach of contract, the jury returned a verdict against the business on the negligent misrepresentation claim and the district court denied a motion for judgment notwithstanding the verdict. The business appealed, and we transferred the case to the court of appeals, who affirmed the decision of the district court. On further review, we vacate the decision of the court of appeals and reverse the decision of the district court. We conclude the business owed no duty of care in supplying the information to the plaintiff. We reverse the judgment of the district court and remand for the case to be dismissed.

## I. Factual Background and Proceedings.

In 2012, Phelps Implement (Phelps) hired Moeller & Walter, LTC, a lumberyard, to provide building materials and to oversee the construction of an addition to its existing implement dealership. Moeller & Walter subcontracted with Lumber Specialties to provide the truss[1] package, headers and columns for the doors, and connections and hold downs, in addition to certain engineering services. The engineering services included structural building design,[2] a structural site visit,[3]

---

[1]A roof truss is an assemblage of beams arranged in a triangle to form a rigid framework that supports the ceiling, insulation, roof, steel, and snow load.

[2]This project, due to its size, required a permanent bracing plan that would ensure the building would not collapse once in use.

retaining wall engineering,[4] and an existing building truss review.[5] Finally, Lumber Specialties provided an industry standard temporary bracing plan.[6] The contract did not provide for engineering services pertaining to the temporary bracing of the trusses and did not require Lumber Specialties to evaluate the temporary bracing during the course of the construction.[7] In all, Lumber Specialties contracted to provide $33,247 worth of tangible building materials and approximately $4150 worth of engineering services. Phelps also hired Dinsdale Construction to supply the labor and building materials for the project.

On June 28, the owner of Moeller & Walter, Lynn Trask, visited the Phelps site and met with Kirk Dinsdale, the owner of Dinsdale Construction. By this time, the construction was underway, with some of the smaller trusses placed and supported by temporary bracing. Trask and Dinsdale agreed the construction should be evaluated to ensure the chosen method of temporary bracing was sufficient, especially considering the larger trusses would be going up soon. Later that day,

---

[3]Steve Kennedy, an engineer who works with Lumber Specialties, was to do a postconstruction site visit assessing the permanent bracing, connections, and hold downs. Lynn Trask of Moeller & Walter acknowledged that the "site visit" item referred to a postconstruction, not midconstruction, assessment.

[4]Phelps requested a concrete retaining wall to separate the project from a neighboring residential area.

[5]Once the addition was attached to an existing Phelps building, additional engineering services would be needed to ensure the structure could handle the extra load.

[6]The BCSI-B1 Summary Sheet, published by the Structural Building Components Association and Truss Plate Institute, is provided with the sale of every truss by Lumber Specialties. Steve Kennedy testified that engineers could, though none did prior to the collapse, draft a site-specific temporary bracing plan. He also testified the BCSI-B1 was a conservative approach that would be sufficient in most structures and that less bracing would be sufficient in others.

[7]Although invoices from Select Structural Engineering, another subcontractor on the project, referenced temporary bracing design assisted by Lumber Specialties, these were for services rendered after the cause of action arose.

Trask emailed Ryan Callaway, a sales representative for Lumber Specialties. Trask wanted Callaway to visit the site to "take a look at what [Dinsdale Construction] ha[s] done" and advise "[i]f there is any bracing that [is] missing." Email from Lynn Trask, Moeller & Walter LTC to Ryan Callaway, Lumber Specialties (June 28, 2012, 11:35 a.m.). Callaway felt comfortable performing this visit, and he did so that afternoon. He also believed Trask and Dinsdale should have been able to rely on his opinion.

Callaway had prepared the quote for the Phelps project. He had also worked in construction for approximately twenty years. Prior to working with Lumber Specialties, Callaway studied architectural and construction drafting at a community college for one year. He then worked in residential remodeling before accepting a job with Plumb Building Systems (Plumb), another truss manufacturer. At Plumb, Callaway worked in truss design, using software to design project-specific trusses. After three years, he left Plumb and worked a brief stint at a factory before accepting a position with Lumber Specialties, again working in truss design. After another four years, he transitioned to sales, where he has been for approximately ten years. In his capacity as sales representative, he no longer does building designs, nor does he install trusses. His primary job responsibilities involve customer relations and preparing bids.

Callaway characterized the visit to Phelps as a courtesy to his customer, Trask. When he arrived at the Phelps site, Dinsdale was working with his crew on the roof. Callaway looked around, introduced himself, left some promotional pencils, and said something to the effect of, "Everything looks great. Keep doing what you're doing." Dinsdale did not know Callaway was a sales representative; he only knew Callaway

was from Lumber Specialties. Callaway was on-site for only a short time.[8] The next day Callaway emailed Trask:

> I stopped by the Phelps site yesterday. They were still installing purlins[9] and bracing on the trusses that they had set. Steve Kennedy will be doing the final inspection on the building which will include inspecting the bracing. If needed, recommendation will [be] made at that time. Please give Steve at least three day['s] lead time to schedule the final inspection on the building. Thank you.
>
> Ryan Callaway
>
> Outside Sales

Email from Ryan Callaway, Lumber Specialties to Lynn Trask, Moeller & Walter LTC (June 29, 2012, 06:18 a.m.). Trask replied:

> Thanks Ryan,
>
> I am aware Steve will be doing the inspection when done. Just thought it would be good to have you stop and check progress [to] see if there are any obvious things that you see that could create more stability during the set stage. Thanks for stopping. Let me know if you have any suggestions or saw anything that I need to be aware of.
>
> Thanks, Lynn
>
> Lynn Trask
> Moeller & Walter LTC

Email from Lynn Trask, Moeller & Walter LTC to Ryan Callaway, Lumber Specialties (June 29, 2012, 09:56 a.m.). Callaway replied:

> Nothing "jumped" out at me that needed more temporary bracing. I thought everything looked good on what they had completed.

Email from Ryan Callaway, Lumber Specialties to Lynn Trask, Moeller & Walter LTC (June 29, 2012, 10:05 a.m.). Trask concluded the conversation:

---

[8]While Dinsdale estimates Callaway was on-site for approximately thirty minutes, Callaway himself believes it was only around ten.

[9]Purlins are horizontal beams along the length of the roof providing structural support.

That's what I was really asking for.

I have a lot of confidence in you[r] experience and opinion.

Thanks, Lynn

Email from Lynn Trask, Moeller & Walter LTC to Ryan Callaway, Lumber Specialties (June 29, 2012, 11:39 a.m.).

Nine days later, the structure collapsed. There was no personal injury or property damage, but the parties incurred substantial costs in rebuilding the structure. A postcollapse investigation revealed the collapse was due to inadequate temporary bracing of the trusses. Dinsdale had not followed the industry standard temporary bracing plan.

Dinsdale Construction brought suit against Lumber Specialties on breach of contract (as a third-party beneficiary) and negligent misrepresentation theories. Lumber Specialties moved for summary judgment, arguing, among other things, it had no duty to use reasonable care in providing Callaway's interim assessment of the adequacy of the temporary bracing erected by Dinsdale Construction. It argued it was a product manufacturer that should be categorically excluded from owing a duty under existing Iowa law. The district court denied the motion, finding negligent misrepresentation was a question for the jury. After Dinsdale Construction presented its evidence at trial, Lumber Specialties moved for directed verdict, again arguing the negligent misrepresentation claim should not be submitted to the jury. The district court denied the motion. The jury returned a verdict for Dinsdale Construction on the negligent misrepresentation claim, but found no breach of contract. Lumber Specialties moved for judgment notwithstanding the verdict, reiterating that it owed no duty to Dinsdale Construction under Iowa negligent misrepresentation law. The district court again denied the

motion, finding the court had already ruled on the issue and that whether Lumber Specialties was in the business of supplying information was a fact question the court appropriately submitted to the jury. Lumber Specialties appealed. The court of appeals affirmed, holding the question was for the court, but finding that Lumber Specialties had a duty of care because it was in the business of supplying information at the time of the misrepresentation. We granted further review.

## II. Standard of Review.

"We review the denial of a motion for judgment notwithstanding the verdict for correction of errors at law." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). Whether the defendant owed a legal duty is "always a question of law for the court." *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996). We review the evidence in the light most favorable to the nonmoving party. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

## III. Analysis.

The Restatement states,

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552, at 126–27 (Am. Law Inst. 1977) [hereinafter Restatement]. We first recognized and adopted the tort of negligent misrepresentation in providing information in *Ryan v. Kanne*, rejecting the narrow approach of the common law rule at the time, represented by cases such as *Ultramares Corp. v. Touche*, 174 N.E. 441

(N.Y. 1931). *See Ryan v. Kanne*, 170 N.W.2d 395, 401–03 (Iowa 1969). We instead followed the path paved by the Restatement, then in its draft form. *See id.* at 402–03 (citing Restatement (Second) of Torts § 552 (Am. Law. Inst., Tentative Draft No. 11, 1965)).

Two decades after adopting the tort, we began to narrow our approach, finding the "duty . . . is generally not applicable to a retailer in the business of selling and servicing his merchandise." *Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 581 (Iowa 1990); *see also Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995) ("Although the language of the Restatement (Second) of Torts supports a broad view of the types of businesses covered by the tort, our appellate cases reflect a rather narrow scope." (Footnote omitted.)). We later affirmed this position, stating, "Where the defendant is not in the business of supplying information, and the parties deal at arm's length in a commercial transaction, our courts have refused to recognize a duty arising under section 552." *Fry*, 554 N.W.2d at 265–66 (Iowa 1996) (citing *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller*, 514 N.W.2d 905, 910 (Iowa 1994); *Meier*, 454 N.W.2d at 581–82; *Greatbatch*, 534 N.W.2d at 118). Thus, under Iowa law, normally only those in the business of supplying information to others owe a duty to ensure that information is correct, accurate, and thorough. *See Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (Iowa 2001) (noting restrictions on the tort are due to the "fear that liability for misinformation could be virtually unlimited . . . under the traditional foreseeability limitation applicable to negligence claims"). Other jurisdictions follow similar approaches. *See, e.g., Rankow v. First Chi. Corp.*, 870 F.2d 356, 360 (7th Cir. 1989) (applying Illinois law) ("Illinois law only allows recovery for purely economic losses under a negligent

misrepresentation theory when the defendant is 'in the business of supplying information for the guidance of others . . . .' " (quoting *Rankow v. First Chi. Corp.*, 678 F. Supp. 202, 205 (N.D. Ill. 1988))); *Millsboro Fire Co. v. Constr. Mgmt. Serv., Inc.*, C.A. No. 05C-06-137 MMJ, 2006 WL 1867705, at *3 (Del. Super. June 7, 2006) ("In Delaware, only . . . those expressly in the business of supplying information . . . can be liable in tort for purely economic losses.").

In our effort to distinguish those circumstances when a person has a duty to use reasonable care in supplying information from those circumstances when there is no duty, we have articulated various considerations derived from the framework of the Restatement rule. We seek to distinguish advisory relationships from relationships that are adversarial and at arm's length. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). We seek to distinguish the sale of information as a product from information given incidentally as part of another transaction. *Id.* at 112. We distinguish professional purveyors of information from those who work in another capacity. *Id.* Finally, we seek to capture the concept of foreseeability within those circumstances that impose a duty of care. *Id.* at 111–12.

These considerations are principles of law that help frame the parameters of the tort and express its rationale more than they are factors to weigh in determining the existence of a duty. In each instance, we must only impose a duty on persons who, "in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest," supply information to others in their business transactions. Restatement § 552(1), at 126. The distinctions we have observed exist to help in the application of this rule and are often aligned with the presence or absence of a pecuniary interest in

giving the information. *See Sain*, 626 N.W.2d at 124–25; *Molo Oil Co.*, 578 N.W.2d at 227 ("[I]f the transaction at issue took place at arm's length, the plaintiff's cause of action must fail."); *Fry*, 554 N.W.2d at 266 (noting allowing recovery for negligent misrepresentation in adversarial relationships would allow "recover[y] in tort on the same factual grounds on which the law would deny . . . recovery in contract"); *Meier*, 454 N.W.2d at 581 (noting in an arm's length transaction "the law of contract and warranty may provide the more appropriate remedies for misstatements"). *Compare Pitts*, 818 N.W.2d at 113 ("The advisory nature of the principal–agent relationship supports allowing a claim of negligent misrepresentation."), *and Sain*, 626 N.W.2d at 126 ("The counselor and student have a relationship which extends beyond a relationship found in an arm's length transaction."), *with Jensen v. Sattler*, 696 N.W.2d 582, 588 (Iowa 2005) (denying recovery where relationship was between seller and buyer of a home); *Haupt*, 514 N.W.2d at 906, 910 (accord, between banker and consumer in loan guarantee transaction).

In this case, Lumber Specialties is in the business of providing a variety of products and services, some of them information and others not. *See Greatbatch*, 534 N.W.2d at 117 (noting "[n]o clear guideline exists" and many businesses "fall[] somewhere in the middle of the spectrum"); *see also Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs., LLC*, 877 F. Supp. 2d 614, 619–20 (N.D. Ill. 2012) ("[I]t may be useful to 'envision a continuum [of enterprises] with pure information providers at one end and pure tangible good providers at the other[].' " (quoting *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999))). Lumber Specialties contracted to provide both tangible construction materials (trusses, headers and columns, and

connections and hold downs) and intangible engineering services (designs, site visits, reviews). Thus, Lumber Specialties operates a "mixed" business.[10] *See Rankow*, 870 F.2d at 365 (describing " 'mixed' cases, where both goods (or services) and information were exchanged").

When a person is in the business, profession, or employment that both sells products and supplies information for the guidance of others, it is necessary to look at the specific transaction that gives rise to the claim of liability. *See Pitts*, 818 N.W.2d at 112–13 (noting insurance agent acting as insurance salesperson would not be a proper defendant but imposing duty when acting as an agent to the insured). Thus, even though the tort normally only applies to a person in the business of supplying information, when a business engages in mixed services, the specific transaction must be examined to determine if the person had a pecuniary interest in the transaction. *See* Restatement § 552 cmt. *c*, at 129 ("The rule . . . applies only when the defendant has a pecuniary interest in the transaction in which the information is given.").

As explained in *Sain*, the pecuniary interest that a person has in a business, profession, or employment that supplies information to others gives rise to the factors that support the imposition of a duty, such as the awareness, foreseeability, and justifiable reliance compatible with a special relationship. 626 N.W.2d at 124–25 (noting those in the business

---

[10]Lumber Specialties argues we follow Illinois courts who have adopted a strict ends and aims of the transaction test. *See Hartford Fire Ins. Co.*, 877 F. Supp. 2d at 620 ("[I]f the intended end result of the relationship is for the defendant to create a product—a tangible thing—then the defendant will not [be in] the 'business of supplying information' . . . ."); *see also id.* (noting architects and engineers might supply information, but the end result will be a tangible product (examples include a building and a water supply system), and thus they are not in the business of supplying information). Because we resolve this matter using our existing law, we need not reach whether we should adopt such a test, or whether it would even apply to the facts of this case.

of supplying information are "also in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect"). Although we have not yet applied the tort beyond persons in the course of their business or profession of supplying information, section 552(1) of the Restatement includes persons who supply false information "in any other transaction in which [they have] a pecuniary interest."[11] Restatement § 552(1), at 126. Transactions involving a pecuniary interest share the attributes of a business, profession, or employment supplying information to others, as well as the rationale for imposing a duty. The key to the imposition of a duty to use reasonable care in supplying information necessarily involves a pecuniary interest in supplying the information. Restatement § 552(1) cmt. *c*, at 129.

The comments to the Restatement provide examples that give context to the rule. When the information is given to others in the course of a defendant's business, a pecuniary interest normally exists even though no consideration may be given at the time. *Id.* cmt. *d.* The operation of the business supports the existence of pecuniary interest. *See also Pitts*, 818 N.W.2d at 113. Yet, this basis for imposing a duty is not conclusive. Restatement § 552(1) cmt. *d*, at 130. If a defendant who works in a business or profession that supplies information to others

---

[11]A tentative draft of the Restatement (Third) of Torts: Liability for Economic Harm, parallels the current section 552. *See* Restatement (Third) of Torts: Liab. for Econ. Harm §§ 5, 6 (Tentative Draft No. 1, 2012). However, it splits the tort into negligent misrepresentation and negligent performance of services, though "[n]o substantive differences are intended," *id.* § 5 cmt. *a*, and "[n]othing should depend on [the] characterization," *id.* § 6 cmt. *a.* The comments to draft-section 5 note the requirement "serves several purposes," including "confin[ing] liability to cases where information is offered in a sufficiently serious spirit to make the plaintiff's reliance reasonable" and avoiding the chilling of gratuitous speech. *Id.* § 5 cmt. *c.* We note that both of these concerns are present here.

gives information but not in the course of the business or profession and does not expect or receive compensation or financial remuneration for the information, no duty arises. The classic illustration of this rule is a lawyer who gives a "curbstone" opinion. *Id.*

The comments to the Restatement further identify the source of the financial interest requirement of the rule when information is given in the course of a transaction with another. Here, the pecuniary interest requirement normally comes from the consideration paid or given to the person who supplies the information as a part of the transaction. *Id.* This consideration does not necessarily need to be direct. *Id.* It can also be indirect. *Id.*; *see also Sain*, 626 N.W.2d at 126. Thus, corporate officers who stand to profit from transactions by others in the corporation have a pecuniary interest in the transaction. Restatement § 552(1) cmt. *d*, at 129. Likewise, agents of a corporation who expect to receive compensation on sales of information have pecuniary interests, even though the sale may not ultimately be completed. *Id.* The important characteristic of the consideration is the expectation of compensation of some form at some time for giving the information to another.[12] *See Sain*, 626 N.W.2d at 126.

---

[12]The comments to the tentative draft of the Restatement (Third) of Torts: Liability for Economic Harm section 5 state, when the defendant made a representation to a plaintiff with whom the defendant has no direct commercial relationship, "The important question then is whether speaking will redound to the defendant's economic benefit in some reasonably clear way, perhaps because it helps another party with whom the defendant has a contract." *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 5, cmt. *c*. To the extent this comment could apply, we do not find it reasonably clear Callaway's misrepresentations were intended to redound to his economic benefit. The comments also discuss the professional who is typically paid to speak but supplies the information without charge and note liability can turn on the regularity of providing "free" advice. *See id.* ("The regularity suggests that providing certain advice for 'free' is part of the defendant's business, not an isolated favor with unconsidered implications."). There is nothing in the record to suggest Callaway provided similar opinions with any regularity, let alone regularity sufficient for us to conclude it was his business to do so.

In this case, Lumber Specialties did not contract with Moeller & Walter or Dinsdale Construction to provide engineering services pertaining to the temporary bracing work. It did, however, through its employee, supply Moeller & Walter and Dinsdale Construction with information or advice concerning the integrity of the bracing work. This was done outside the scope of the contract, and the duty question turns on whether Callaway or Lumber Specialties had a pecuniary interest in the informational transaction.

No evidence was presented at trial to reveal any direct consideration was paid to Lumber Specialties or Callaway for supplying the interim assessment of the temporary bracing. Furthermore, no evidence was presented at trial to show Callaway received direct consideration from Lumber Specialties for supplying the temporary bracing information to Moeller & Walter and Dinsdale Construction. No information was presented to show Callaway was responsible to supply the information as a part of his job responsibilities. Additionally, no evidence was presented that Callaway had an expectation that Lumber Specialties or either Moeller & Walter or Dinsdale Construction would compensate him for giving the information. Instead, the evidence at trial showed Callaway supplied the information as a courtesy to a customer in furtherance of the overall business interests of Lumber Specialties. This is the evidence Dinsdale Construction asserts supports the imposition of a duty based on the rule that indirect consideration can be sufficient to establish a pecuniary interest in supplying information. *See Nationwide Agribus. v. Structural Restoration, Inc.*, 705 F. Supp. 2d 1070, 1081 (S.D. Iowa 2010) (finding an indirect financial interest for information provided "as a 'sales tool' ").

In *Nationwide*, the defendant was engaged in a business of inspecting and repairing silos. *Id.* at 1080. The defendant inspected the plaintiff's silo free of charge and wrote a letter to the plaintiff describing the results of the inspection, which the plaintiff alleged misrepresented its condition. *Id.* at 1078. The silo subsequently collapsed. *Id.* at 1075. The court found the defendant had an indirect financial interest in the inspection to support imposing the duty of care because the information was done as a "sales tool" to procure future repair services for compensation. *Id.* at 1081. The court found the facts in that case supporting its conclusion the defendant had an indirect pecuniary interest analogous to the facts in *Sain*. *Id.* (citing *Sain*, 626 N.W.2d at 126). Contrary to this observation, we do not find the facts in *Sain* analogous.

In *Sain*, we held that a high school counselor had an indirect pecuniary interest in supplying information to a student athlete concerning his eligibility to pay college basketball, even though the student athlete did not pay any consideration to the counselor. 626 N.W.2d at 120, 126. We found the consideration paid to the counselor by the school system to provide advice and information to students constituted sufficient pecuniary interest. *Id.* The indirect pecuniary interest in *Sain* was not supplied by the future expectation of direct consideration for future transactions as in *Nationwide*. *Compare id., with Nationwide*, 705 F. Supp. 2d at 1081. The defendant in *Nationwide* had inspected the plaintiff's silos a few years earlier and submitted a bid at that time to perform restoration services. *Nationwide*, 705 F. Supp. 2d at 1073. The inspection and bid did not result in a contract, but it was viewed as part of a business model that would lead to contracts. *See id.* at 1075. The inspection and bid were a common component to the sales

transaction. *See id.* at 773. When the defendant inspected the silos a second time, it knew the silo owner was concerned about the condition of one of the silos. *Id.* at 1074. It also knew the inspection could lead to the procurement of future restoration-services contract for consideration. *Id.* at 1075. Thus, at least some evidence suggested the gratuitous inspection was part of an overall sales technique to support a finding of a financial interest in making the inspection. *See id.* at 1081.

Unlike in *Nationwide*, there is no evidence in this case to support finding an expectation that the requested inspection done by Callaway would result in additional or future transactions for the purchase of building materials or engineering services by Moeller & Walters, Dinsdale Construction, or any other entity or person. There was also no evidence that the actions by Callaway in making a cursory inspection of the trusses was part of a business model or "sales tool" used by Lumber Specialties to procure future sales or services. Nothing was said during the course of the transaction and no representations were made about future sales.[13]

We conclude the district court erred in failing to grant the motion for judgment notwithstanding the verdict made by Lumber Specialties. The tort of negligent misrepresentation is not broad enough for the pecuniary interest in a transaction to come from general goodwill potentially derived by a business in supplying requested advice or information to a customer as a courtesy following the sale of a product. A transaction of this nature is too attenuated and abstract from those contemplated by the Restatement to impose a duty of care. Although

---

[13]We note Callaway passed out promotional pencils bearing Lumber Specialties' name. Even taking the evidence in the light most favorable to Dinsdale Construction, as we must, we do not find this dispositive.

some degree of foreseeability and reliance may result from a gratuitous opinion, no special relationship is created to impose the duty of care without a pecuniary interest. In effect, Callaway's casual observations requested by Moeller & Walter expressed nothing more than a "curbstone opinion" excluded from the imposition of duty under the tort.

### IV. Conclusion.

As one commentator asserts, "Negligent misrepresentation has become the most facile tort theory available to a construction project participant who would recover purely economic loss from another participant." *See* Carl J. Circo, *Placing the Commercial and Economic Loss Problem in the Construction Industry Context*, 41 J. Marshall L. Rev. 39, 87 (2007). In Iowa, negligent misrepresentation is not subject to the economic loss rule. *See Van Sickle*, 783 N.W.2d at 694. It can, and has, been applied to a variety of businesses. *See Pitts*, 818 N.W.2d at 112 (noting tort has been applied in Iowa to "accountants, appraisers, school guidance counselors and investment brokers"). Yet, the doctrine does have limits. A duty is normally only imposed on those in the business of providing information because this is the most common example of those who are paid for or otherwise have a pecuniary interest in providing the information that gave rise to the dispute. The duty is imposed because it is fair to hold these professional purveyors of information to the foreseeable consequences of their actions. We do not impose a duty on defendants who do not have a pecuniary interest in the transaction, nor do we impose a duty where the defendant is not acting in its information-giving capacity. Callaway's statements fall in the former category. This question of duty was for the court to decide, and the district court erred in denying Lumber Specialties' motion for judgment notwithstanding the verdict.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**